HARRY DANSON, *Plaintiff in Error, v.* THE STATE OF FLORIDA, *Defendant in Error.*

1. General objections to evidence proposed, without stating the precise grounds of objection, are vague and nugatory, and are without weight before an appellate court, unless the evidence objected to is palpably prejudicial, improper and inadmissable for any purpose or under any circumstances.

2. The trial court is authorized to regulate the order of the introduction of evidence, and its discretion in such a matter, either

in receiving or rejecting evidence, will not be interfered with by an appellate court, unless an abuse of such discretion is clearly made to appear.

3. The mere fact that proffered evidence is not full and complete within itself but forms only one link in the chain, so that it would have to be supplemented by other evidence in order to avail the party offering it, may not render such evidence incompetent or inadmissible.

4. Where documentary evidence has been offered by the plaintiff in a trial and admitted over the objection of the defendant, if, by reason of what subsequently occurred in the trial, the defendant conceived that such documentary evidence had not been sufficiently connected by other evidence to make it admissible or that for any other reason it was incompetent, or improper, the proper way to have removed it from the consideration of the jury was by a motion to strike it out.

5. Upon a writ of error, the respective parties litigant are presumed to have had their day in court and to have had the points at issue between them fairly and impartially tried and determined in accordance with the law of the land. The final judgment is presumed to be correct, and this presumption must be met in the appellate court and overcome by the plaintiff in error.

6. Upon a writ of error, the plaintiff in error becomes the actor in the appellate court, whether he occupied the position of plaintiff or defendant in the court below, and upon him rests the burden. It is incumbent upon him to show that the different rulings of the trial court of which he complains, or some of them, are so infected with error as to call for and compel a reversal of the judgment. The mere fact that technical error was committed by the trial court in some of its rulings may not be sufficient; the errors must have been harmful or prejudicial to the rights of the plaintiff in error.

7. Upon the trial of a defendant for the murder of a member of the police force of the City of J., it is not error for the court in its charge to instruct the jury generally as to the power and authority of such police force to make arrests without

warrant, even though, technically speaking, the evidence may not show that an arrest was actually made. After having so charged the jury, it is not error to refuse to instruct the jury as to what constituted a legal arrest, there being no question before the jury as to an actual arrest by the deceased policeman, lawful or unlawful.

8. Evidence examined and found sufficient to support the verdict.

This case was decided by Division A.

Writ of error to the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*Jno. E.* & *Julian Hartridge,* for Plaintiff in Error;

*Park Trammell,* Attorney General, for the State.

SHACKLEFORD, J.—Harry Danson was indicted for murder in the first degree, tried and convicted of murder in the second degree, and seeks relief here by writ of error.

The first three assignments, which are argued together, are severally based upon the introduction in evidence, over the objection of the defendant, of Section 65 of the "Acts of Incorporation of the City of Jacksonville," as it is designated in the transcript, and of Sections 351 and 354 of the ordinances of such city. These sections relate to the duties and powers of the police force, designate certain crimes and provide for the punishment of those convicted thereof. We find that the sole grounds of objection urged against the introduction of these respective sections were that "the same was irrelevant and not pertinent to the issues in the

case." We have held again and again that general objections to evidence proposed, without stating the precise grounds of objection, are vague and nugatory, and are without weight before an appellate court, unless the evidence objected to is palpably prejudicial, improper, and inadmissible for any purpose or under any circumstances. See Putnal v. State, 56 Fla. 86, 47 South. Rep. 864, and McKinnon v. Johnson, 57 Fla. 120, 48 South. Rep. 910. We have also repeatedly held that the trial court is authorized to regulate the order of the introduction of evidence, and its discretion in this matter will be interfered with by an appellate court only when a clear abuse thereof is made to appear. Putnal v. State *supra,* and McMillan v. Reese, 61 Fla. 360, 55 South. Rep. 388. We might well declare that, applying these two principles, these assignments have not been sustained, but, in view of some of the other assignments which have to be treated and in order to make this opinion more readily understood, we will give a brief statement of what the evidence had developed at the stage of the trial when this documentary evidence was proffered. Hesekiah Hires, with whose murder the defendant stood charged, was a member of the police force of the City of Jacksonville, and was in the discharge of his duty as such at the time that he was killed. Dan Danson, the father of the defendant, was engaged in the saloon business in the City of Jacksonville, and on the night the tragedy occurred Lieutenant James P. Morgan, of the police force, in passing by such saloon, about 2 o'clock, noticed that some people were in it, rapped at the door, had Dan Danson come and unlock it and informed him that he must not have people in there so late, but must get them out. After some discussion had taken place between Danson and the officer, during which the officer informed him that he must get the peo-

ple out of the saloon and close it up, else he, the officer, would "go get the wagon and arrest all of you," Danson agreed to do what the officer had demanded, and the officer waited there until Danson had put the people out and locked the door, when the officer passed on. Very shortly thereafter, the officer met Hires, the deceased, and informed him that he had made Danson put some negroes out of his saloon and close it up. Hires then asked the officer if he wished him to go up there, to which he replied, "No, no use to go down there now, I stood there and seen them all out, seen it closed up." Charles R. Ammons had testified that he was a member of the police force and on the night of the tragedy a man came to him in a hack and told him that he had been assaulted at Danson's saloon and requested such policeman to go up there with him. As such saloon was on the beat of Policeman Hires, the deceased, and was about two blocks away from the beat of Policeman Ammons, he telephoned to police headquarters for instructions and was told to go up to Danson's saloon and see about the matter, which he proceeded to do. When he reached the saloon he found it open and found Dan Danson and two or three others there. Upon the policeman asking Danson what the trouble was there, explaining to him that he had been telephoned from police headquarters to come there and make an investigation, Danson talked boisterously and insolently refused to give any information, also refused to let the policeman go into his saloon and use his telephone to report the situation to police headquarters. Thereupon Ammons asked Danson to go with him to another telephone, so that he could make his report, but Danson also refused to do this, when Ammons took hold of his arm and started off with him. Prior to this he had begun to abuse Ammons, which he continued, swear-

3—vol. 62

ing at him, calling him opprobrious names, indulging in the grossest profanity, and making threats against Ammons. Finally, he began striking at Ammons, who defended himself and struck Danson on the shoulder or arm with a light summer club, which the policemen were then carrying. Just about the time Danson was making his third pass at Ammons, some one fired a shot, which struck Ammons in the head. About that time, Hires, the deceased, came up and asked, "Here, what's all this about?" Another shot followed the first in almost immediate success in which struck and killed Hires. Ammons drew his pistol after the second shot was fired and discharged it six times, killing Dan Danson. The testimony had further developed that Dan Danson was considerably under the influence of liquor at the time that Harry Dannon, the defendant, who was the son of Dan Danson, was employed in his father's saloon, and shortly after Officer Morgan had been to the saloon and ordered it closed the defendant took a pistol out of a drawer in the saloon and put it in his pocket. The testimony had further developed the fact that the defendant was standing in front of the saloon with a pistol in his hand just before the first shot was fired and at the time Ammons was talking to Dan Danson, and finally that the defendant fired the first two shots, the first one of which struck Ammons and the second struck and killed Hires. Much other testimony had also been introduced, the greater portion of which was of little material consequence and threw but little light on the tragedy. We have set forth what we conceive to be the most important portions, though necessarily in a very condensed form.

At this stage of the trial the documentary evidence was offered and admitted in evidence, over the objection of the

defendant.   Section 65 of the Charter of the City of Jacksonville, the first of such instruments, contains the following provision: "The police force shall have power and authority to immediately arrest, without warrant, and take into custody any person who shall commit or threaten, or attempt to commit in the presence of a member of it, or within his view, any breach of the peace or offense directly prohibited by act of the Legislature, or by ordinance, of the City Council."

Section 351, the second of such instruments, provides for the punishment of "Any person convicted of endangering or disturbing the public peace, or violating public decency by using any abusive, obscene or profane language, or by making any threats, of violence, to or against any other person or persons, or by using profane, obscene or indecent language or by being drunk or by being noisy or disorderly, in or upon any street, square, or other public place, within the City Limits," and then proceeds to designate certain other offense.   Section 354, the third of such instruments, makes it unlawful for any person owning or conducting a saloon within the limits of the City of Jacksonville "to keep the same open or any door or aperture thereof which could or might be used as a means of ingress or egress to such premises ————— on the Sabbath day," requires that all saloons "shall be closed from 12 o'clock at night until 5 o'clock in the morning," and provides that "Any person or persons violating any of the provisions of this section be, and the same are hereby declared to be disorderly persons, dangerous to the peace and morals of the city, and he, she or they shall on conviction before the Municipal Court, be punished as provided in Section 348."

In view of the evidence which had already been adduced, the salient features of which we have given above,

as well as in view of the fact that the trial judge did not and could not know what further proceedings would be had in the trial, it is obvious, without further comment, that no error was committed in admitting such documentary evidence as against the grounds of objection urged. In addition to the authorities previously cited, see Atlantic Coast Line R. R. Co. v. Partridge, 58 Fla. 153, 50 South. Rep. 634, wherein we also held that "The mere fact that proffered evidence is not full and complete within itself, but forms only one link in the chain, so that it would have to be supplemented by other evidence in order to avail the party offering it, may not render such evidence incompetent or inadmissible." If, by reason of what subsequently occurred in the trial, the defendant conceived that such documentary evidence had not been sufficiently connected by other evidence to make it admissible or that for any other reason it was incompetent or improper, the proper way to have removed it from the consideration of the jury was by a motion to strike it out. Rentz v. Live Oak Bank, 61 Fla. 403, 55 South. Rep. 856, and McMillan v. Reese, 61 Fla. 360, 55 South. Rep. 388.

Before taking up any of the other assignments for treatment, we think it advisable to state that, after introducing the documentary evidence in question, the State proceeded to prove by four different witnesses certain conversations had with the defendant, after he was arrested, the substance of which was that he admitted he had shot Ammons because Ammons and his father (Dan Danson) "were having trouble, and it looked like he (Ammons) was going to club his father." The defendant then went on to say: "After I shot Ammons I turned to walk back to the corner; I seen this other policeman, I didn't know his name, but I seen this other policeman, and I shot him because I was afraid he might hurt me." It is not con-

tended here that the testimony of the witnesses as to these admissions or confessions of the defendant was erroneously admitted, though it was objected to in the trial court and exceptions noted to the rulings thereon. We have examined the transcript, and are of the opinion that a proper and sufficient predicate is clearly shown to have been laid for the admission of such confessions. We would add that the only thing which Hires, the deceased, said or did, after he reached the scene of the tragedy, which is disclosed by the transcript, was to ask the question which we have copied above. Almost immediately thereafter he met his death at the hands of the defendant. The defendant introduced no testimony whatever.

In a long line of decisions this court has held that "upon a writ of error, the respective parties litigant are presumed to have had their day in court and to have had the points at issue between them fairly and impartially tried and determined in accordance with the law of the land. The final judgment is presumed to be correct, and this presumption must be met in the appellate court and overcome by the plaintiff in error." See the discussion therein and prior decisions cited in McKinnon v. Lewis, 60 Fla. 125, 53 South. Rep. 940, and Baker & Holmes Co. v. Indian River State Bank, 61 Fla. 106, 55 South. Rep. 836. As was also said in McKay v. Lane, 5 Fla. 268, text 276: "This court has uniformly proceeded upon the practice not to reverse a judgment, however erroneously an isolated point may have been ruled by the judge below, when it is clearly apparent that the party complaining had been in no way injured by the improper ruling." To the like effect is our holding in Southern Home Insurance Co. v. Putnal, 57 Fla. 199, 49 South. Rep. 922, and Pensacola Electric Co. v. Bissett, 59 Fla. 360, 52 South. Rep. 367, wherein still other decisions of this court will

be found collected. As we further held in McKinnon v. Lewis, *supras* "Upon a writ of error, the plaintiff in error becomes the actor in the appellate court, whether he occupied the position of plaintiff or defendant in the court below, and upon him rests the burden. It is incumbent upon him to show that the different rulings of the trial court of which he complains, or some of them, are so infected with error as to call for and compel a reversal of the judgment. The mere fact that technical error was committed in the trial court in some of its rulings may not be sufficient; the errors must have been harmful or prejudicial to the rights of the plaintiff in error."

These principles will prove of material assistance to us, we think, in disposing of such of the other assignments that, in our opinon, merit treatment.

The fourth assignment is based upon the following portion of the charge given by the court: "Gentlemen of the jury, the police force of the City of Jacksonville have the power and authority under the laws of the State of Florida, to immediately arrest without warrant, and take into custody any person who shall commit or threaten or attempt to commit in the presence of the arresting officer, or within his view, any breach of the peace or offense directly prohibited by the act of the legislature or by the ordinance of the City Council of said city."

This assignment is discussed by the plaintiff in error together with the first three assignments, which we have already disposed of, but we perfer to treat it separately. It is contended that there was no evidence adduced of an arrest, therefore such charge was uncalled for, unwarranted and violative of the established principle that charges and instructions should be confined to the evidence in the case. In reply to this contention, it may be admitted that the evidence may not show, technically

speaking, that Dan Danson was ever arrested by Police-man Ammons, but it does show that such policeman had seized and taken hold of Dan Danson by the arm. In the light of the evidence adduced, it can hardly be contended that the policeman was not authorized to arrest Dan Danson without a warrant, whether he actually did arrest him or not. See Robertson v. State, 42 Fla. 223, 28 South. Rep. 424, and Robertson v. State, 43 Fla. 156, 29 South. Rep. 535, 52 L. R. A. 751. The portion of the charge complained of would seem to have stated the law correctly, especially when taken in connection with the entire charge and instructions given. Be all this as it may, we feel that we can say affirmatively from a consideration of the entire record that the defendant was not and could not have been injured by the giving of such portion of the charge. See Starke v. State, 49 Fla. 41, 37 South. Rep. 850, and Cross v. Aby, 55 Fla. 311, 45 South. Rep. 820.

The ninth assignment is as follows: "The court erred in refusing to charge the jury, upon the request made by the jury through Deputy Sheriff Williamson, on the law as to what constitutes a legal arrest." We find that the showing made in the bill of exceptions upon this point is as follows: "And afterwards the said jury did send down to the said Judge, by and through one Ed. Williams, a Deputy Sheriff, who was then in charge of and having custody of said jury during their deliberation, and who was duly appointed Deputy to R. F. Bowden, Sheriff of Duval County, Florida, a request to the said Judge that he, the said Judge, instruct the jury and charge them on the law as to what constituted a legal arrest. But the said Judge upon receiving said request made as aforesaid by the said jury during their deliberations, did decide and refuse because there was no evidence before them that

there was an arrest to which decision and refusal the defendant did then and there except."

It is urged strenuously that the court was inconsistent and misleading, in charging upon the power of the police to make arrests and in stating that there was no arrest, but we find no such inconsistency. The duties of the police were described to the jury, that it might be made plain why Hires appeared as he did upon the scene. Danson was not on trial for shooting Ammons, who may or may not have been within his official rights in the seizure of the elder Danson—an issue not now material—but the law so laid down clearly and correctly charged that Hires was in his line of duty, and there was no question before the jury as to an actual arrest, lawful or unlawful.

We shall not undertake to discuss the other assignments, though we have given them all our careful examination. See Hinson v. State decided here at this term, and prior decisions of this court therein cited, especially Gee v. State, 61 Fla. 22, 54 South. Rep. 458.

We are clear that no reversible error has been made to appear to us, therefore the judgment must be affirmed.

WHITFIELD, C. J., and COCKRELL, J., concur;

TAYLOR, HOCKER and PARKHILL, J. J., concur in the opinion.