738 So.2d 382 (1999)
Gernard JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 98-1956.
District Court of Appeal of Florida, Fourth District.
June 23, 1999.
Rehearing Denied August 13, 1999.
*383 Robert L. Bogen of Law Offices of Robert L. Bogen, Boca Raton, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Joseph A. Tringali, Assistant Attorney General, West Palm Beach, for appellee.
HAZOURI, J.
Gernard Jackson was convicted and sentenced on two counts of armed kidnaping, three counts of robbery with a firearm, one count of armed burglary and one count of misdemeanor battery. Jackson raises four points on appeal and we affirm on all four points; however, we choose to discuss points I and II.

FACTS
On August 20, 1997, Gwen and Gerry Brinson were at their home between 9:15 and 9:30 P.M. They noticed their nephew, Michael Walden, outside their front window. They were not expecting him but when he knocked they let him in. Gwen Brinson gave him something to eat and let him use the phone. Less than ten minutes later someone knocked at the Brinsons' carport door. Michael started to let them in but Gwen stopped him and went to see who it was. She spoke with Joel Walkes, a friend of her son, Cedric, and he asked to come in. In order to hear him better, she opened the glass window on the door and then someone's hand pushed the screen in and unlocked the door. That person was armed with a handgun and Gwen ran and locked herself in her utility room.
Joel had driven Tyson Brinson home that evening. They noticed a car parked next door and when they turned to approach it, the car drove toward the Brinsons' yard and stopped. There were five men in the car. Three of them jumped out of the car and grabbed Joel and Tyson and held them at gunpoint. At that point, two of the assailants wore stocking masks which did not yet cover their faces and the third did not have a mask at all. The two with masks had covered their faces by the time they reached the door.
Joel Walkes described the three men. One was a black male, approximately 6'2" and weighing 200 pounds. Another was described as more than 200 pounds and not wearing a mask. The third man was skinny, "a hundred and something pounds," who both Joel and Tyson identified in court as Jackson. The two boys testified that they saw Jackson for a few seconds or at a glance. Joel testified that Jackson was carrying a small Uzi. Tyson described the man who grabbed him as a "red, red guy" and slim and skinny. He was wearing a Tommy Hilfiger shirt that had red, yellow and green stripes.
Months before trial both Joel and Tyson were shown photo lineups with Jackson's photo. Joel was unable to pick him out. Tyson testified that he did pick Jackson *384 out but a Broward County sheriff deputy testified that none of the victims were able to pick Jackson out of the photo lineups, including Tyson. The first positive identification of Jackson came during the trial when Joel and Tyson testified.
In order to bolster the identification of Jackson as one of the perpetrators, the state presented the testimony of Eunice Polloway, an employee of BellSouth who was designated by BellSouth as its records custodian. Over Jackson's objection, certain BellSouth telephone computer records were admitted as business records.[1] These computer printouts showed that a phone call was made from the Brinson household at 9:25 P.M. on the evening of August 20, 1997, to a pager number. Michael Agha, owner of the pager service for the number called, testified that on August 20, 1997, the number was assigned to his customer, Gernard Jackson. Agha could not testify that Jackson possessed the pager that night or that he received the page. There was no other evidence to connect Jackson to this crime.

ANALYSIS
Jackson's points I and II on appeal are interrelated. In point I Jackson contends that the trial court erred in overruling his objection to the admission of the phone records under the business records exception to the hearsay rule. In point II, he seeks reversal for a new trial contending that evidence was insufficient to prove that he was one of the perpetrators. Jackson contends that the eye witness testimony against him was highly questionable and it was essential to the state's case that Bell-South's records be admitted into evidence to make the connection between Jackson and the crime scene. The trial transcript reflects that the state in its final argument relied heavily upon the BellSouth records to bolster the eye witness identification.
Without detailing the direct and cross examination of the two eye witnesses, suffice it to say that the record reflects that their identification testimony can best be characterized as tenuous. The two identifying witnesses' opportunity to view their assailants was limited by duration (a couple of seconds), by darkness and an inability to get a head-on-view. They were in fear for their lives at the time of their observation. Jackson was a stranger to them and they had never seen him either before or after the crime. Having failed to identify Jackson in a pretrial photo lineup shortly after the crime, the initial identification of Jackson by these witnesses was at the trial where Jackson was the only black man in the courtroom at defense counsel's table. This in-court identification occurred seven months after the crime.
The eye witness identification of Jackson is similar to the eye witness identification that our supreme court criticized in Mason v. State, 438 So.2d 374 (Fla.1983). Mason was charged with murder and the only eye witness to the crime was the victim's eleven year old daughter, Missy Chapman. Calling into question the credibility of this identification, the court stated as follows:
We agree with appellant that Missy Chapman's identification of him as the assailant has little credibility. Before the trial she stated that when the murderer was in the bedroom, his back was towards her and she could not "actually see what he looked like." At a lineup held one week after the killing, Missy failed to identify appellant as the killer and when photographs of those in the lineup were later shown to her she again failed to pick him out. Finally, at trial, almost one year after the murder, Missy identified appellant as the man that she had seen. He was, however, the only black man at counsel's table and she had been informed that the man charged with killing her mother would be in the courtroom. The courtroom conditions were too suggestive, and her prior attempts too unsuccessful, to give much *385 credence to Missy's identification of appellant.
Id. at 378.
Despite the highly questionable identification, Mason's conviction was upheld because there was other substantial evidence that connected him to the crime. That evidence consisted of finger prints that were identified as Mason's and found on the sill of the window where the killer evidently entered the house. The state's expert witness also testified that some of Mason's hair was found at the scene of the crime. There was also collateral crime testimony admitted during the trial. There was no such evidence in this case to connect Jackson to the crime scene.
Eunice Polloway, a BellSouth employee, was brought in by the prosecution to testify as to the aforementioned BellSouth records. In attempting to qualify her as an appropriate witness to give such testimony, the following pertinent testimony was elicited:
Q: What do you do for Bell South?
A: I'm a specialist in security and records custodian.
Q: As part of being a specialist in security and records custodian, could you briefly describe what you do?
A: One of the functions is to respond to subpoenas and provide company records when they're needed in Court?
* * *
Q: These documents that you are referring to now are these documents that are kept in Bell South's course of normal business operations?
A: Yes, sir.
Q: And being a custodian of records for Bell South, these are things that are privy to you that you can retrieve and refer to in answering questions in a Court of law?
A: Yes, sir.
* * *
Q: Ms. Polloway, being a custodian of records you keep document [sic], right?
A: Yes, sir.
Q: Did you bring documents today here to Court to help you testify to this matter that's before the Court today?
A: Yes, sir.
* * *
Q: That information that you just told us about, State's A for identification, are those records kept in the normal course of business operations for Bell South?
A: Yes, sir.
Q: Are these regular business documents that you refer to when you testify in a Court of law?
A: Yes, sir.
Q: Being a custodian of record for Bell South you have access of keeping these document and retrieving them you yourself when you need them?
A: Yes, sir.
Thereafter, the state moved the records into evidence. Jackson's counsel made the following objection: "I object on lack of foundation." The trial court overruled the objection but permitted the defense counsel to voir dire the witness which elicited the following information:
Q: Ms. Polloway, I just have a couple of quick questions that I want to ask you. What steps did you take to get these records yourself?
A: These records were retrieved by the subpoena compliance group and forwarded to me. These are records that are kept on line that we can access.
Q: Okay. So you didn't get these records yourself?
A: No, sir. I did not.
* * *
Q: So someone in your company would have to come to you and given you these?
A: Yes, sir.
Q: Is there any way that as you look at these to verify their accuracy?
A: Yes, sir. They came directly to me. They were faxed to my office and I *386 received them, and discuss them with the senior supervisor.
Q: Okay. So after you received this you talked to someone else about it?
A: That's correct.
Q: That had been involved in obtaining them?
A: Yes, sir.
We agree with Jackson that the state did not establish the necessary basis for the admission of the BellSouth records pursuant to section 90.803(6)(a), Florida Statutes (1997). However, Jackson's counsel failed to make an objection that specifically identified the defects in the state's offer of these records.
In general, an appellate court may review only those questions properly presented to the trial court. Mariani v. Schleman, 94 So.2d 829 (Fla.1957). Preservation of an error involving a ruling admitting evidence requires a timely objection which states the "specific ground of objection if the specific ground was not apparent from the context." § 90.104(1)(b), Fla. Stat. (1997). The purpose of this rule is to permit the trial judge "to understand the issue raised and to give the adverse party notice of the alleged defect" in the offer of evidence. Anderson v. State, 546 So.2d 65 (Fla. 5th DCA 1989).
The objection "lack of foundation," like its first cousin "improper predicate," is not a "specific ground of objection" within the meaning of section 90.104(1)(a) so as to preserve a ruling admitting evidence for appellate review. See Jackson v. State, 456 So.2d 916 (Fla. 1st DCA 1984); Bailey v. State, 358 So.2d 1169 (Fla. 3d DCA 1978).
In order to be admissible, a business record pursuant to section 90.803(6)(a) must be shown to have been:
1. Made at or near the time of the event;
2. By or from information transmitted by a person with knowledge;
3. Kept in the course of a regularly conducted business activity; and
4. That it was the regular practice of that business to make such a record.
Eunice Polloway was designated by BellSouth as a records custodian to respond to subpoenas. No one asked her any questions to establish that she was a "qualified witness" under section 90.803(6)(a) to testify as to whether the records were made at or near the time of the event recorded or whether the records were made by or from information transmitted by a person with knowledge.
As we have noted, appellate courts will not consider grounds for objections to the admissibility of evidence unless they have been stated with specificity at trial. See Danson v. State, 62 Fla. 29, 56 So. 677, 678 (1911) (stating general rule that "general objections to evidence proposed, without stating the precise grounds of objection, are vague and nugatory, and are without weight before an appellate court"); Tabasky v. Dreyfuss, 350 So.2d 520 (Fla. 3d DCA 1977). The general, non-specific objection in this case"lack of foundation"did not alert the state or the trial court as to what portion was missing from the foundation for the admission of business records under section 90.803(6)(a). With a specific objection not only can the trial court make an intelligent and informed decision but it would also give the state an opportunity to correct the defects, where possible, by asking additional questions of the witness or calling an additional witness who might be able to correct the defects.
We recognize that these records were important to the state's case in light of the rather tenuous eye witness identification; however, the failure to make the proper objection which in turn obviated the state's need to cure the defects requires us to affirm the conviction.
AFFIRMED.
KLEIN and GROSS, JJ., concur.
NOTES
[1] § 90.803(6)(a), Fla. Stat. (1997).