778 So.2d 1017 (2000)
James Reno ALEXANDER, Appellant,
v.
STATE of Florida, Appellee.
No. 4D99-2410.
District Court of Appeal of Florida, Fourth District.
December 20, 2000.
Rehearing Denied February 1, 2001.
*1018 H. Dohn Williams, Jr. of H. Dohn Williams, Jr., P.A., Fort Lauderdale, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Frank J. Ingrassia, Assistant Attorney General, Fort Lauderdale, for appellee.
WARNER, C.J.
In this appeal from his conviction for first degree murder and kidnapping, for which appellant was sentenced to life in prison, appellant makes two challenges to evidence admitted which appellant claims is inadmissible hearsay. The first statement related to appellant's participation in another crime which the state claimed provided evidence of appellant's motive to participate in the murder. The second series of statements were made by a co-conspirator and admitted under that exception to the hearsay rule. Appellant also raises as error the trial court's failure to answer a jury question prior to the jury arriving at its verdict. On all issues, we affirm.
The victim, Louis Gordon, was last seen alive on September 11, 1996. Two days later the victim's friends notified police that he was missing. Upon arriving at the victim's condominium, the police noticed that his vehicle was gone and that the light fixture above his parking space had recently been broken. The police began an investigation that eventually led to appellant being indicted for first degree murder and kidnapping. Gordon's body was discovered three months later, contained in a 55 gallon drum, wrapped in a garbage bag, and encased in concrete. The drum was recovered from a canal in Palm Beach County.
The state's theory of appellant's involvement in this crime was based upon a series of dealings between appellant, co-defendant Ron Tramontano, the victim, and the state's chief witness David Swartz. On May 31, 1996, Greg Mill's red Chevrolet Corvette was stolen at gun point by appellant and Ron Tramontano. Appellant admitted in a later statement to the police that he had participated in the carjacking for the purpose of selling the car to Gordon. In his statement, appellant also acknowledged that while the relationship between Tramontano and Gordon was fine in June of 1996, it later deteriorated because there was a dispute about payment for the stolen Corvette, and Tramontano suspected Gordon of stealing or vandalizing his motorcycle.
David Swartz was a hairdresser in Deerfield Beach and was acquainted with both appellant and Tramontano. On September 10, 1996, Swartz met the two for lunch to *1019 plan the abduction of Gordon. Tramontano asked Swartz to rent a small van that would fit inside Gordon's garage. Swartz told Tramontano that Gordon had weights and furniture that belonged to Swartz, and Tramontano promised to get all of Swartz's property back. As a result of the meeting, the three men drove to a car rental agency where Swartz tried unsuccessfully to rent a van. After that, appellant returned to work, and Swartz and Tramontano went to another car agency and rented a van. Later that afternoon, appellant rejoined the two at Swartz's house. They discussed where to dispose of Gordon's body, and the three of them, along with Swartz's wife, Mandy, went to look for a canal. She testified at trial that Tramontano stated, in the presence of appellant, that they were going for a ride to look for a lake in which to dump a body.
Mandy testified that after they returned from the drive, Tramontano told Swartz that they would pick him up the following morning, September 11, to stake out Gordon's home. The next morning, appellant and Tramontano arrived with a truck. As the three walked out of the house, Swartz testified that Tramontano stated that Gordon would have to be killed. Swartz followed appellant and Tramontano to a paint store where all three men purchased painter's masks. A store clerk testified that he had sold such masks to three men on that date, but he could not identify the men. After purchasing the masks the trio went to Gordon's condominium and waited for Gordon. Swartz left to go to work before Gordon arrived, but later Tramontano and appellant found Swartz and told him to come along, as they had abducted Gordon. Appellant was driving the van, and Tramontano was sitting on Gordon, who was handcuffed and bloody. Swartz drove the truck and followed the van out to the west. At that point, Gordon got out of the van and into the truck, and Swartz drove away in the van. Swartz never saw Gordon again.
Swartz returned to work at the salon, and Mandy took the van back to the car rental agency, noticing spots of blood in the van. When she got back, both appellant and Tramontano were present, and both had cement dust and spots of blood on their clothing. The owner of the salon also testified that she saw appellant and Tramontano at the salon that afternoon.
Mandy also testified that appellant and Tramontano brought a duffel bag containing money, jewelry, certificates of deposit, and a street sweeper gun. Later that evening they arrived at the Swartz home in a red Corvette. The next day, September 12, appellant and Tramontano again arrived at Swartz's home requiring him to accompany them in the truck, in the back of which was a 55 gallon drum cement barrel with ten to fourteen bags of empty cement. Appellant told Swartz that Gordon's body had been placed in the barrel. The three drove to the Hillsboro canal, where the drum was dumped.
The owner of the truck rental agency testified that on September 13, appellant returned the truck. It had a powdery dust and a cement type mix in it. Forensic examination also revealed that the truck had human blood in it. Also on that date, Tramontano and Swartz drove to the driver's license bureau where Swartz obtained a driver's license in Gordon's name, using false documents. Using the fake driver's license, they intended to cash the certificates of deposit belonging to Gordon. Appellant's girlfriend testified that a couple of days prior to September 13, he had asked her how Swartz could cash some certificates of deposit. She told him that an identification was needed.
Swartz was arrested as a result of attempting to secure the driver's license. Ultimately, he was suspected in Gordon's disappearance. The prosecutor granted him immunity, and his testimony was a significant part of the state's case against appellant. However, in addition to Swartz's testimony and that of his wife, Mandy, and appellant's girlfriend, the *1020 state offered other incriminating evidence at trial, including one witness who saw appellant displaying a gun similar to the one Gordon owned. There was also evidence that appellant told Swartz to keep his wife from talking because he had made one person disappear and someone else could just as easily disappear.
Appellant testified and admitted his involvement in the carjacking of the Corvette but denied that he had anything to do with Gordon's abduction and murder. He stated that he did not have lunch with Tramontano and Swartz that day. He admitted renting a truck that evening but testified that he was using it to move furniture for his two sisters the next day. Both sisters testified and confirmed his alibi. However, appellant's girlfriend testified that she was present on that occasion, and it did not occur on either September 11, 12, or 13, 1996. Further, appellant testified that he returned the truck on September 12, even though the owner of the agency testified that the truck was returned the following morning.
Appellant was charged with kidnapping and first degree murder. The jury found him guilty of both counts. After adjudicating appellant guilty, the court sentenced appellant to life in prison without parole for first degree murder and five years for the kidnapping count.
As his first issue, appellant claims that the court erred in overruling his objection as to "lack of foundation" in permitting Swartz to testify that prior to the lunch meeting on September 10, 1996, Tramontano mentioned to Swartz that appellant did not get his share of the money from Gordon for stealing the Corvette. The prosecutor used this statement to establish a motive for appellant's participation in the crime. Appellant argues on appeal that his objection was that the statement was inadmissible hearsay, because the statement was given prior to the formation of the conspiracy. The objection was not preserved by an objection to "lack of foundation." See Filan v. State, 768 So.2d 1100 (Fla. 4th DCA 2000); Jackson v. State, 738 So.2d 382 (Fla. 4th DCA 1999), rev. denied, 751 So.2d 1252 (Fla. 2000). However, even if it was preserved, we would still conclude that no error was shown. While a statement of an alleged co-conspirator which the prosecution seeks to admit must be made during the course and in furtherance of the conspiracy as that time period is defined in the charging document, see Nelson v. State, 602 So.2d 550 (Fla. 2d DCA 1992), there is nothing to suggest that Tramontano's statement was not made within the time period as charged in the document. The statement was made in passing "previous to sitting at the Crazy Horse," and reviewing the statement in context indicates that it could have been made on the same day. The trial court's rulings on evidence will not be reversed unless there has been a clear abuse of discretion. See Geldreich v. State, 763 So.2d 1114, 1116 (Fla. 4th DCA 1999), rev. denied, 767 So.2d 456 (Fla.2000). We cannot conclude that the trial court clearly abused its discretion in this case.
Appellant next complains that the state never met the threshold for admitting Tramontano's statements as those of a co-conspirator. In Christie v. State, 652 So.2d 932 (Fla. 4th DCA 1995), we said:
Before the jury could consider any hearsay evidence of the co-conspirators, the state must have established, by a preponderance of evidence, through defendant's actions or his statements or through other competent, independent evidence that defendant participated in a conspiracy. Romani v. State, 542 So.2d 984, 985 n. 3 (Fla.1989); Gueits v. State, 566 So.2d 829 (Fla. 4th DCA 1990); State v. Edwards, 536 So.2d 288, 292 n. 3 (Fla. 1st DCA 1988). This court must examine whether there was "substantial evidence, free from the taint of hearsay, upon which the court could find, at least preliminarily, that a conspiracy existed and the person objecting to the hearsay *1021 statements was an active participant." See Verni v. State, 536 So.2d 1162, 1164 (Fla. 2d DCA 1988), review denied, 542 So.2d 1335 (Fla.1989).
652 So.2d at 933. As can be gleaned from the facts set forth in this opinion, there was substantial evidence presented to meet this standard, including all of appellant's actions testified to by Swartz, his wife, his girlfriend, and other friends. In addition, Swartz testified that appellant told him that they had put the victim in the barrel. There was no error in admitting the co-conspirator statements.
Finally, by way of supplemental briefing, appellant claims that we should reverse because the trial court failed to answer a jury question prior to its rendering of the verdict. Shortly after the jury retired to deliberate, it sent out a question. The jury asked, "If the defendant is guilty of kidnapping, is he thenby the wording of the lawlogically guilty of felony murder?" Appellant suggests that the answer to that is contained in Standard Jury Instruction 2.08(a), on which the jury was already instructed. The jury appears also to have been given a written copy of the instructions. Because the trial judge was overseeing the selection of a jury for another case, which was known to the parties, between 20 and 45 minutes passed from the time the jury question was received to the time it arrived at its verdict without the question being answered. Appellant's counsel did not object to the judge's failure to answer the question at the time.
Not only is this issue not preserved by a contemporaneous objection at trial, we cannot conclude that the failure to answer the jury question constituted harmful error when the jury was appropriately instructed on the law in question, including the standard jury instruction that appellant himself suggests would have answered the jury question. Rule 3.410 of the Florida Rules of Criminal Procedure permits, but does not require, additional jury instructions when the jury poses questions to the court. See Perriman v. State, 731 So.2d 1243, 1246 (Fla.1999).
While a judge has an obligation to make a reasonable effort to review the question and provide an answer to the jury, it is not reversible error when circumstances prevent its answer before the jury arrives at a verdict. In United States v. Rodriguez, 765 F.2d 1546 (11th Cir. 1985), the trial court announced that he had to leave court after the jury retired because he had scheduled a sentencing hearing in another county the next day. He arranged to be contacted if a question came up. The next morning the jury asked a question. The judge's law clerk attempted to contact the judge but was unable to reach him immediately. The jury continued to deliberate and arrived at a verdict within the hour. The judge called after the verdict was reached and did not answer the jury's question. He arrived back at the courthouse that afternoon. Over objection of defense counsel, he denied the defendant's request to see the question and declined to answer the question, ordering that the jury's verdict be published. The court held that there was no error in failing to answer the question where the judge's inability to answer the question was not due to a lack of diligence.
In the instant case, the delay in answering the question also was not due to a lack of diligence but the difficulty of a diligent judge to be in two places at once, as well as the difficulties in getting the attorneys back in the courtroom, as they must be present for any communications between the judge and jury. We can discern no harmful error in what transpired.
Affirmed.
STONE, J., and GLICKSTEIN, HUGH, S., Senior Judge, concur.