# Supreme Court of Florida

_____

No. SC17-472
_____

**GABRIEL BRIAN NOCK,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

November 1, 2018

CANADY, C.J.

In this case, we consider an issue regarding the rule of completeness codified in the Florida Evidence Code and a related issue concerning the rule of evidence authorizing the impeachment of hearsay declarants. This Court granted jurisdiction to review the decision of the Fourth District Court of Appeal in *Nock v. State*, 211 So. 3d 321 (Fla. 4th DCA 2017), in which the district court certified conflict with the Second District's decision in *Foster v. State*, 182 So. 3d 3 (Fla. 2d DCA 2015), on the latter issue. We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const.

Specifically, two issues are presented on review: (1) whether a defendant is permitted to require the State under section 90.108(1), Florida Statutes (2014)—the statutory rule of completeness—to introduce into evidence the entire video recording of the defendant's statement to police when the State has questioned a detective on direct examination concerning inculpatory statements of the defendant without introducing any portion of the recording of the defendant's statement and (2) whether the State is permitted to impeach a defendant under section 90.806(1), Florida Statutes (2014)—which authorizes attacking the credibility of a hearsay declarant—when the defendant elicits from the detective on cross-examination exculpatory portions of the defendant's statement to the police.

We hold that section 90.108(1) does not apply unless a written or recorded statement is introduced into evidence. We also hold that a defendant is subject to impeachment under section 90.806(1) whenever the defendant introduces through cross-examination hearsay exculpatory statements of the defendant. We approve the decision of the Fourth District in *Nock*, and we disapprove the decision of the Second District in *Foster* on the conflict issue.

## BACKGROUND

In the case on review, "[a] jury found [Nock] guilty of first degree murder while engaged in the commission of a robbery and tampering with physical evidence." *Nock*, 211 So. 3d at 323. The trial court entered judgment in

accordance with the guilty verdicts and "sentenced [Nock] to life imprisonment with a concurrent term of 120 months." *Id.* On appeal from the conviction and sentence, the Fourth District set out the facts of the crimes:

The evidence revealed that the victim, a sixty[-]eight-year-old retired man, took [Nock], a twenty-seven-year-old man, home with him from the beach. When the victim did not show up later that day for a planned dinner, the victim's friend went to his house. There, he discovered the victim lying face down in the kitchen.

A detective arrived at the scene and spoke to witnesses, who saw the victim eating with a younger man on his back porch earlier that day. A medical examiner determined the victim had extensive injuries to his neck consistent with pressure being applied to the area. He questioned whether it was horseplay or erotic choking, but determined more force was likely used to cause the victim's death.

During the investigation, law enforcement discovered videos showing [Nock] using the victim's credit card at various Broward County stores. Surveillance videos showed the victim's car at locations where the card was used. [Nock] actually gave his phone number to a cashier while using the victim's credit card.

Law enforcement obtained a pen-register/trap and trace order to access information concerning [Nock's] cell phone, and an order specifically authorizing the use of real time cellular site information ("CSLI") to track the cell phone. Six days after the victim's death, a Broward detective was notified that [Nock's] cell phone had been turned on for the first time in three days. The cell phone signal was tracked to South Beach.

Broward law enforcement traveled to South Beach in unmarked police cars. Using a still photo of [Nock] from a surveillance video, they located him. They flagged down a Miami Beach police officer, who detained [Nock].

When the detective arrived, he introduced himself to [Nock], who responded by asking whether he was being approached about the car or the warrant out of Delaware. The detective observed [Nock] in possession of a tote bag with the victim's initials on it. The detective saw the victim's business cards, credit cards, car keys, and a lap top computer inside the tote bag. He confirmed [Nock's] cell phone as

- 3 -

the one they were tracking and noted [Nock's] resemblance to the still photo.

Broward law enforcement then took [Nock] to their office where he gave a Mirandized statement to the detective. Neither party introduced the video recording of the interrogation into evidence. Instead, the State called the detective to testify about [Nock's] statement.

On direct examination, the detective testified that [Nock] initially stated he did not know the victim and he had bought all the items from someone on the beach. [Nock] later acknowledged he knew the victim. The detective testified: "[Nock] put his head down and shook his head and said, he wasn't suppose[d] to die, it wasn't suppose[d] to happen this way, and then he began telling me more details about what had happened."

[Nock] told the detective that he left the beach with the victim, who was going to pay him for sex. The victim had a wrestling fetish and asked [Nock] to engage in "wrestling moves" where he would put the victim in a headlock until he "tap[ped] out," indicating that the move was too forceful. This activity first occurred upstairs in the victim's home. [Nock] then took the victim's wallet and credit cards before going downstairs.

In the kitchen, [Nock] again put the victim in a headlock, but this time the victim collapsed. [Nock] claimed the victim never tapped out. He became scared when he could not wake the victim. He then poured bleach around the kitchen and living room to cover up his presence, grabbed whatever items he could, and left in the victim's car.

*Id.* at 322-23 (some alterations in original). The Fourth District also set out the

following relevant information regarding Nock's trial:

[Prior to trial, Nock] filed a motion [in limine] seeking to require the State to admit the entire video recording of [Nock's] statement into evidence, under the best evidence rule and the [statutory] rule of completeness. The trial court denied the request, specifically finding the rule of completeness [contained within section 90.108(1), Florida Statutes (2014),] inapplicable because the State did not offer the video into evidence. The [trial] court stated that if the desired portions of the statements were elicited when the defense

cross-examined the detective, then section 90.806(1), Florida Statutes (2014), allowed the State to use [Nock's] prior convictions for impeachment.

[Nock] later renewed his rule of completeness objection during the State's direct examination of the detective; the court denied the motion. During a sidebar, the State suggested that [Nock] was free to introduce the video in his portion of the case. Rather than do so, the defense cross-examined the detective regarding the exculpatory portions of [Nock's] statement, which supported his defense of the victim's death being an accident.

As a result, the jury was later advised of [Nock's] "nine prior convictions of felonies or crimes involving dishonesty." The trial court instructed the jury that the prior crimes were not evidence of guilt and should only be used in assessing [Nock's] credibility.

*Id.* at 323.

Nock raised an issue before the Fourth District "concerning the detective's testimony regarding [Nock's] statement" to the police. *Id.* at 322. In that issue, Nock argued that "the trial court abused its discretion in denying his motion in limine and overruling his subsequent objections concerning the introduction of [Nock's] entire recorded statement." *Id.* at 324. Specifically, Nock argued that: "(1) the rule of completeness applie[d]" under section 90.108(1) and "(2) the trial court erred in permitting the State to impeach [Nock's] credibility with evidence of his prior felony convictions" under section 90.806(1). *Id.*

The Fourth District rejected each of Nock's arguments on appeal concerning the detective's testimony regarding Nock's statement to the police. *Id.* at 324-25. As to the first argument, the Fourth District concluded that "the trial court properly ruled the [statutory] rule of completeness inapplicable" because the State

"questioned the detective on direct examination about his conversation with [Nock]" without "introduc[ing] [Nock's] recorded statement" into evidence. *Id.* at 324. The Fourth District explained that "the [statutory] rule of completeness does not apply when the written or recorded statement is not introduced into evidence." *Id.* As to the second argument, the Fourth District concluded that "the [trial] court correctly permitted the jury to learn of [Nock's] nine prior felonies and crimes of dishonesty" because "defense counsel brought out the exculpatory portions of [Nock's] statement during cross-examination of the detective." *Id.* at 325. The Fourth District acknowledged that the position advanced by Nock's second argument—"that he should not be subjected to impeachment through his prior felonies just because he cross-examines a witness about his statement"—is supported by the Second District's decision in *Foster*. *Id.* at 324. "There, the Second District held [that once the State introduced a portion of the defendant's statement into evidence,] the defendant was entitled to have the jury hear the remainder of his statement without placing his credibility in issue [under section 90.806(1)]." *Id.* However, the Fourth District concluded that *Foster* is contrary to section 90.806(1), precedent of the Fourth District, and this Court's decisions in *Kaczmar v. State*, 104 So. 3d 990 (Fla. 2012), and *Huggins v. State*, 889 So. 2d 743 (Fla. 2004). *Nock*, 211 So. 3d at 324-25.

The Fourth District rejected the remaining issues raised by Nock, affirmed his conviction and sentence, and certified conflict with *Foster*. *Id.* at 323-25.

**Analysis**

**I. Completeness**

We first address whether a defendant is permitted to require the State to introduce the entire video recording of the defendant's statement to the police into evidence under section 90.108(1)—the statutory rule of completeness—when the State questions a detective on direct examination about his conversation with the defendant without introducing any portion of the recording of the defendant's statement into evidence. Although this issue is not the basis of the certified conflict, we exercise our discretion to address the issue. *See, e.g.*, *Cantor v. Davis*, 489 So. 2d 18, 20 (Fla. 1986) ("Once this Court has jurisdiction, however, it may, at its discretion, consider any issue affecting the case."). The standard of review is de novo. *See D'Angelo v. Fitzmaurice*, 863 So. 2d 311, 314 (Fla. 2003).

**A. The Common Law Rule of Completeness**

The rule of completeness began as a common law rule of evidence. At common law, the rule of completeness provided that "the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Beech Aircraft Corp. v. Rainey*, 488 U.S.

153, 171 (1988) (alteration omitted) (quoting 7 John H. Wigmore, *Evidence in Trials at Common Law* § 2113, at 653 (J. Chadbourn rev. 1978)).

> The common law version of the rule of completeness permit[ted] the proponent to prove such part as he desire[d]. At common law, the opponent c[ould not] force the proponent to broaden the scope of his questioning of the witness. However, when the proponent turn[ed] the witness over to the opponent for questioning, the opponent c[ould] then elicit the other parts relevant to the same topic.

1 Kenneth S. Broun*, McCormick on Evidence* § 56 (7th ed. 2013) (footnote omitted).

> The origins of the [common law] rule [of completeness] go back to the sixteenth century and the focus was on different parts of the same writing or statement. *See* Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 4:10 (15th ed. 1997). Lord Chief Justice Charles Abbott recognized the danger in admitting only a portion of a conversation in evidence, explaining "one part taken by itself may bear a very different construction and have a very different tendency to what would be produced if the whole were heard, for one part of a conversation will frequently serve to qualify and to explain the other." *Id.* (quoting *Thomson v. Austen*, 2 Dowl. & R. 358, 361 (1823)).
> A "classic example of the possibilities of distortion" when a portion of a statement is omitted is where one mentions only the last phrase of the bible quote, "The fool hath said in his heart, there is no God." *McCormick on Evidence* § 56 (Kenneth S. Broun, et al. eds., 6th ed. 2006) (citing 7 John H. Wigmore, *Evidence in Trials at Common Law* § 2094 (Chadbourn rev. 1978)). Quoting the Bible as saying "there is no God," would "be a misleading half-truth because it divorces the quotation from its context." *Id.*

*Carter v. State*, 226 So. 3d 268, 273-74 (Fla. 4th DCA 2017).

The common law rule of completeness had two purposes: (1) to ensure "that the court not be misled because portions of a statement are taken out of context"

and (2) to avoid "the danger that an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material." *Beech Aircraft Corp.*, 488 U.S. at 171 n.14 (emphasis omitted); *see United States v. Burns*, 162 F.3d 840, 853 (5th Cir. 1998). It also had two limitations: (1) that the additional portions of the statement be "relevant" to an issue in the case and (2) that the additional portions of the statement be "necessary" to "qualify or explain the already introduced evidence allegedly taken out of context." *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986); *see United States v. McCorkle*, 511 F.2d 482, 486-87 (7th Cir. 1975) (en banc).

Florida's common law rule of completeness applied not only to written and recorded statements but also to testimony about conversations and oral statements. *See, e.g.*, *Morey v. State*, 72 So. 490, 492-93 (Fla. 1916) (applying the common law rule of completeness to testimony about oral statements made by the defendant); *Thalheim v. State*, 20 So. 938, 946-47 (Fla. 1896) (applying the common law rule of completeness to testimony about a conversation with the defendant). In particular, Florida's common law rule of completeness applied to testimony about conversations and oral statements "when the state . . . offered evidence of inculpatory statements made by the defendant, and the defendant, *on cross-examination*, s[ought] to show other exculpatory statements, or statements deemed exculpatory, made in the same conversation, in reference to the same

subject-matter." *Thalheim*, 20 So. at 947 (emphasis added); *accord Morey*, 72 So. at 493. In such cases, the "general rule" was that

> the defendant [was] entitled to have before the jury all that was said upon the subject upon the particular occasion, whether prejudicial or beneficial to him. The state having opened the door by proving a part of the conversation, it cannot close it upon the defendant, so that he cannot offer [on cross-examination] the other part of the conversation which relates to the same subject-matter. The whole conversation should be before the jury, and they should determine what weight and effect should be given to the whole conversation.

*Thalheim*, 20 So. at 947; *accord Morey*, 72 So. at 493; *see also Bennett v. State*, 118 So. 18, 19 (Fla. 1928) ("The rule as to admissions in general is that the whole of the statement containing the admission is to be received together."). By requiring defendants to wait until cross-examination to elicit additional portions of conversations and oral statements, Florida's common law rule of completeness accounted for the "practical problem[s]" associated with contemporaneously applying the rule of completeness to testimony on direct examination about conversations and oral statements. *See* § 90.108, Fla. Stat. Ann. (2011) (Law Revision Council Note). These "practical problem[s]" primarily concerned the difficulty of trying to determine, in the middle of a witness examination, the nature, scope, and content of a conversation or oral statement allegedly part of or related to the witness's testimony. *See id.*

## B.  The Statutory Rule of Completeness

In 1976, the Legislature enacted the Florida Evidence Code.  *See* ch. 76-237, Laws of Fla. (codified in ch. 90, Fla. Stat. (Supp. 1976)).  The Florida Evidence Code "replace[d] and supersede[d] existing statutory or common law in conflict with its provisions."  § 90.102, Fla. Stat. (Supp. 1976); *see, e.g.*, *Sikes v. Seaboard Coast Line R. Co.*, 429 So. 2d 1216, 1222 (Fla. 1st DCA 1983).  This Court adopted the provisions of the Florida Evidence Code to the extent that they were procedural.  *In re Fla. Evidence Code*, 372 So. 2d 1369, 1369 (Fla. 1979); *accord In re Amend. of Fla. Evidence Code*, 404 So. 2d 743, 743 (Fla. 1981).

"The [statutory] rule of completeness is codified in section 90.108" of the Florida Evidence Code.  *Christopher v. State*, 583 So. 2d 642, 645 (Fla. 1991).  The "purpose" of section 90.108(1) is "to avoid the potential for creating misleading impressions by taking statements out of context."  *Larzelere v. State*, 676 So. 2d 394, 401 (Fla. 1996).  Section 90.108(1) has not been substantially altered since it was enacted in 1976 and amended in 1978.  Section 90.108(1) provides:

> When a *writing or recorded statement or part thereof* is *introduced by a party*, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously.  An adverse party is not bound by evidence introduced under this section.

§ 90.108(1), Fla. Stat. (2014) (emphasis added).  The 1976 Law Revision Council

Note to section 90.108(1) specifically comments:

> This section does not apply to conversations but is limited to writings and recorded statements because of the practical problem involved in determining the contents of a conversation and whether the remainder of it is on the same subject matter.  These questions are often not readily answered without undue consumption of time.  Therefore, remaining portions of conversations are best left to be developed on cross-examination or as a part of a party's own case.
>
> This treatment of conversations is in accord with *Morey v. State*, 72 Fla. 45, 72 So. 490 (1916), where in a criminal prosecution, when the state offered evidence of inculpatory statements made by the defendant, the court found that the defendant had the right to have placed before the jury, by means of cross-examination, the entire conversation or all statements made by the defendant at the same time and relating to the same subject matter, whether such other statements or the remainder of the conversation are exculpatory in nature.

§ 90.108, Fla. Stat. Ann. (2011) (Law Revision Council Note); *see also*

*Christopher*, 583 So. 2d at 646 (quoting § 90.108(1), Fla. Stat. Ann. (1979) (Law

Revision Council Note)).

Section 90.108(1) by its plain terms "only governs writings or recordings."

*Calloway v. State*, 210 So. 3d 1160, 1184 (Fla. 2017); *accord Reese v. State*, 694

So. 2d 678, 683 (Fla. 1997); *Johnson v. State*, 608 So. 2d 4, 9-10 (Fla. 1992), *death

sentences vacated on other grounds*, 44 So. 3d 51, 68 (Fla. 2010).  Therefore, it is

clear that section 90.108(1) does not apply to testimony about conversations and

oral statements.  Although some of our caselaw contains loose statements

suggesting that section 90.108(1) is applicable when no writing or recorded

- 12 -

statement has been introduced into evidence, *see, e.g.*, *Calloway*, 210 So. 3d at 1184; *Ramirez v. State*, 739 So. 2d 568, 580 (Fla. 1999); *Reese*, 694 So. 2d at 683; *Johnson*, 608 So. 2d at 9-10; *Christopher*, 583 So. 2d at 645-46, we have never actually applied the statute in such circumstances. Instead, we have applied the common law rule of completeness to allow portions of a conversation or oral statement omitted on direct examination to be brought in on cross-examination. Of course, that is not how section 90.108(1) operates. Section 90.108(1) requires the omitted portions of the writing or recorded statement to be introduced by the party who originally introduced the writing or recorded statement, subject to a determination of fairness by the trial court. § 90.108(1), Fla. Stat.; *see Larzelere*, 676 So. 2d at 402 ("Under a plain reading of the statute, parties may seek the introduction of other statements when those statements 'in fairness ought to be considered contemporaneously' with the introduction of the partial statement." (quoting § 90.108, Fla. Stat.)).

"As a general rule of law, self-serving statements are inadmissible under section 90.803(18), Florida Statutes . . . ." *Kaczmar*, 104 So. 3d at 1000; *accord Calhoun v. State*, 138 So. 3d 350, 360 (Fla. 2013). But this Court has not abandoned the common law notion—applied to testimony about conversations and oral statements—that "[w]hen the state offers in evidence a part of a confession or admission against interest, the defendant is entitled to bring out *on cross-*

- 13 -

*examination* the entire confession or admission." *Christopher*, 583 So. 2d at 646

(emphasis added).

### C. The Statutory Rule of Completeness is Inapplicable Here

In this case, Nock filed a motion in limine prior to trial seeking to require the State to admit the entire video recording of Nock's statement to the police into evidence under section 90.108(1). The trial court denied the motion, specifically finding section 90.108(1) inapplicable because the State was not offering the recording into evidence. At trial, the State questioned the detective on direct examination about his conversation with Nock without introducing any portion of the recording of Nock's statement into evidence. Through the detective's testimony, the State introduced the inculpatory portions of Nock's statement into evidence. Nock objected during the State's direct examination of the detective and renewed his motion in limine. The trial court overruled Nock's objections and denied the renewed motion, but permitted Nock to question the detective on cross-examination about his conversation with Nock without restriction. Through the detective's testimony, Nock introduced the exculpatory portions of Nock's statement into evidence and other relevant portions of the statement. But Nock never sought to introduce the video recording of Nock's statement into evidence at any point during the trial.

- 14 -

The trial court did not err in denying Nock's motion in limine and overruling his subsequent objections concerning the introduction of Nock's entire recorded statement. Under this Court's precedent applying the common law rule of completeness to testimony about conversations and oral statements, Nock was entitled to introduce the exculpatory portions of Nock's statement to the police and other relevant portions of the statement on cross-examination of the detective. But Nock was not entitled to require the State to introduce the recording of Nock's statement during its direct examination of the detective under section 90.108(1). The statute was inapplicable because the State never introduced any portion of the recording into evidence. And no other legal basis has been presented for requiring the State, during its direct examination of a State witness, to introduce into evidence a video recording of the interview about which the witness gave testimony.

Nock argues that the Fourth District erred in holding that the "principles" of section 90.108(1) did not apply to the detective's testimony regarding Nock's statement to the police. Nock's argument runs up against the text of section 90.108(1). And we decline to take the text where it does not lead us. The Fourth District correctly concluded that "the trial court properly ruled the [statutory] rule of completeness inapplicable" because the State "questioned the detective on direct examination about his conversation with [Nock]" without "introduc[ing] [Nock's]

- 15 -

recorded statement" into evidence. *Nock*, 211 So. 3d at 324. Section 90.108(1) could not be more clear in limiting its scope to "writing[s] or recorded statement[s] . . . introduced by a party." Accordingly, we expressly approve the Fourth District's conclusion that section 90.108(1) "does not apply when the written or recorded statement is not introduced into evidence." *Id.*

## II. Impeachment

We now address whether section 90.806(1) permits the State to impeach a defendant[1] when the defendant elicits on cross-examination of a State witness exculpatory portions of a statement made to the police by the defendant. The standard of review of this legal question is de novo. *See State v. Dominique*, 215 So. 3d 1227, 1232 (Fla. 2017).

In *Nock*, the Fourth District held that a defendant is subject to impeachment whenever the defendant introduces exculpatory hearsay statements into evidence. The Fourth District certified that its decision is in direct conflict with the decision of the Second District in *Foster*, which held that once the State introduces a portion of the defendant's statement into evidence, the defendant is entitled to have the

---

1. Here, the impeachment was with the defendant's prior convictions. Section 90.610(1), Florida Statutes (2014), provides: "A party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, or if the crime involved dishonesty or a false statement regardless of the punishment . . . ."

jury hear the remainder of the defendant's statement without placing his or her credibility in issue under section 90.806(1). The Fourth District's decision in *Nock* primarily relied on this Court's decisions in *Kaczmar* and *Huggins*, which addressed section 90.806(1); the Second District's decision in *Foster* primarily relied on the concept of "opening the door." To place the issue in proper context, we review the relationship between the rule of completeness and the principle of door-opening before we consider the application of the reasoning of *Kaczmar* and *Huggins* in the present context.

### A.  The Statutory Rule of Completeness: A Subset of the General Principle of Door-Opening

"As an evidentiary principle, the concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted." *Ramirez*, 739 So. 2d at 579 (quoting *Tompkins v. State*, 502 So. 2d 415, 419 (Fla. 1986)). "The concept of 'opening the door' is 'based on considerations of fairness and the truth-seeking function of a trial.' " *Id.* (quoting *Bozeman v. State*, 698 So. 2d 629, 631 (Fla. 4th DCA 1997)); *see McCrae v. State*, 395 So. 2d 1145, 1151-52 (Fla. 1980) (holding that a prosecutor was entitled to inquire into the exact nature of a prior felony conviction where defense counsel sought to establish that that prior conviction was inconsequential). The concept of "opening the door" is also based on "the consideration that without the fuller explication, the testimony that opened the door

- 17 -

would be 'incomplete and misleading.' " *Peterson v. State*, 94 So. 3d 514, 534 (Fla. 2012) (quoting *Lawrence v. State*, 846 So. 2d 440, 452 (Fla. 2003)); *see Overton v. State*, 801 So. 2d 877, 900-01 (Fla. 2001) (agreeing that the State is permitted to fill in the gaps in the testimony to correct a false impression left by the defendant). Similarly, the statutory rule of completeness is based on considerations of "fairness" and "avoid[ing] the potential for creating misleading impressions by taking statements out of context." *Larzelere*, 676 So. 2d at 401-02 (quoting Charles W. Ehrhardt, *Florida Evidence* § 108.1 (1995 ed.)).

"The phrase 'opening the door' has been utilized interchangeably with the [statutory] rule of completeness." *Ramirez*, 739 So. 2d at 580 (citing *Larzelere*, 676 So. 2d at 402). "The [statutory] rule of completeness, however, is a separate evidentiary concept that falls within the general principle of door-opening." *Id.* This Court has consistently acknowledged that point. *See, e.g.*, *Raleigh v. State*, 932 So. 2d 1054, 1064 (Fla. 2006); *Larzelere*, 676 So. 2d at 401-02; *Long v. State*, 610 So. 2d 1276, 1280 (Fla. 1992).

## B. *Kaczmar* and *Huggins*: This Court's Precedent Resolves the Conflict Issue

In *Kaczmar*, this Court considered whether the trial court erred in allowing the State to play an edited version of recorded conversations between the defendant and an undercover detective, during which the defendant thought the detective would help the defendant frame someone else for the murder. *Kaczmar*, 104 So.

- 18 -

3d at 1000. "Specifically, the State redacted [the defendant's exculpatory] statements in the recordings where he stated that he was framing [someone else] because he was innocent." *Id.* "[T]he State warned the defense that introducing the exculpatory statements [under section 90.108(1), Florida Statutes (2007)—the statutory rule of completeness—]would open the door to impeachment of those statements by introducing [the defendant's] prior felonies pursuant to section 90.806(1), Florida Statutes (2007) . . . ." *Id.* at 1001. Section 90.806(1) provides:

> When a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it.

§ 90.806(1), Fla. Stat. (2014).[2] "[I]n response to the State's warning that introducing the exculpatory statements would open the door to [the defendant's] prior felonies, defense counsel chose not to invoke the [statutory] rule of completeness." 104 So. 3d at 1001.

This Court held that "the trial court did not abuse its discretion in allowing the State to introduce the edited versions of the recordings." *Id.* In support of its holding, this Court specifically acknowledged that "pursuant to section 90.806(1),

---

2. Section 90.806(1) has not been altered since this Court decided *Kaczmar*.

- 19 -

once a defendant introduces his or her hearsay statements into evidence by invoking the [statutory] rule of completeness, 'the credibility of the declarant may be attacked just as if the declarant had testified as a witness.' " *Id.* (quoting *Moore v. State*, 943 So. 2d 296, 297 (Fla. 1st DCA 2006)).

This Court laid the foundation for *Kaczmar* in *Huggins*, in which we reasoned that a defendant who chooses not to testify but who succeeds in getting exculpatory statements uttered by the defendant into evidence as hearsay is subject to having those statements impeached under section 90.806(1). We concluded that Huggins had elicited testimony that in effect attributed an exculpatory hearsay statement to Huggins and had thereby "opened the door to his own impeachment." *Huggins*, 889 So. 2d at 756. We thus applied the rule previously applied by district courts that a defendant is subject to impeachment "when the defendant elicits his or her own exculpatory, hearsay statement through another witness at trial." *Id.* at 755-56 (citing *Kelly v. State*, 857 So. 2d 949 (Fla. 4th DCA 2003); *Werley v. State*, 814 So. 2d 1159 (Fla. 1st DCA 2002); *Llanos v. State*, 770 So. 2d 725 (Fla. 4th DCA 2000)).

The reasoning of *Kaczmar* and *Huggins* resolves the conflict between *Nock* and *Foster*. *Foster* relied on the concept of "opening the door" in support of its conclusion that once the State introduces a portion of the defendant's statement into evidence, the defendant is entitled to have the jury hear the remainder of the

defendant's statement without being subject to impeachment under section 90.806(1). *Foster* did not take into account that *Kaczmar* had previously foreclosed this result in a substantially similar context. *Kaczmar* established that a defendant invoking the statutory rule of completeness—a subset of the general principle of door-opening—to introduce exculpatory portions of the defendant's out-of-court statement into evidence would be subject to impeachment on the basis of those hearsay statements. *Foster* likewise did not address the reasoning of *Huggins*, which clearly laid a foundation for *Kaczmar*. There is no basis to permit a defendant to escape 90.806(1) impeachment under the concept of "opening the door" when similarly situated defendants would not escape 90.806(1) impeachment under *Kaczmar*'s application of the statutory rule of completeness and the reasoning of *Huggins*. Therefore, in light of *Kaczmar* and *Huggins*, we expressly approve the Fourth District's conclusion that a defendant is subject to impeachment with the defendant's prior convictions for felonies and crimes of dishonesty under section 90.806(1) whenever the defendant introduces portions of his or her out-of-court self-serving exculpatory statement into evidence.

We thus reject Nock's argument that had the "principles" of section 90.108(1) been applied to the detective's testimony regarding Nock's statement to the police, Nock would not have been "bound" or held responsible for eliciting the omitted portions of his statement and there would have been no section 90.806(1)

impeachment.  *See* § 90.108(1), Fla. Stat. ("An adverse party is not bound by evidence introduced under this section.").  Nock's argument suffers from multiple flaws.  First, it erroneously asserts that section 90.108(1) is applicable to his case.  As explained previously, "the trial court properly ruled the [statutory] rule of completeness inapplicable" because the State "questioned the detective on direct examination about his conversation with [Nock]" without "introduc[ing] [Nock's] recorded statement" into evidence.  *Nock*, 211 So. 3d at 324.  Second, Nock's interpretation of section 90.108(1) is foreclosed by *Kaczmar* and *Huggins*.  Finally, Florida's common law rule of completeness does not require a different result.  The fact that the State has "opened the door" to the introduction of exculpatory hearsay statements of a defendant does not suspend the operation of the rule set forth in section 90.806(1) authorizing the impeachment of hearsay declarants.  We will not impose such a restriction on the operation of the statute that is unwarranted by the text of the Code of Evidence.

**CONCLUSION**

We approve *Nock* and disapprove *Foster*.

It is so ordered.

POLSTON, LABARGA, and LAWSON, JJ., concur.
LEWIS, J., concurs in result.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

PARIENTE, J., dissenting.

This case is not about the rule of completeness but about considerations of fairness and the principle of "opening the door."  In this case, the State made a strategic decision to not introduce Nock's video interrogation, avoiding the rule of completeness, and instead presented the testimony of the detective present during the interrogation, who paraphrased and in some cases inaccurately portrayed Nock's statements.  The State's presentation left the jury with an inaccurate portrayal of Nock's statements and forced Nock into a Hobson's choice: either correct the inaccurate portrayal on cross-examination and be subjected to impeachment or leave the jury with an inaccurate portrayal of the interrogation.  Because of the State's strategic choices, the State was permitted to introduce evidence of Nock's nine prior felony convictions, even though Nock never took the witness stand.

The judicially created principle of "opening the door" is based on "the consideration that without the fuller explication, the testimony that opened the door would be 'incomplete and misleading.' "  *Peterson v. State*, 94 So. 3d 514, 534 (Fla. 2012) (quoting *Lawrence v. State*, 846 So. 2d 440, 452 (Fla. 2003)).  The principle may work against a criminal defendant where the State is permitted to fill in gaps in the testimony to correct a false impression left by the defendant.  *See, e.g.*, *Overton v. State*, 801 So. 2d 877, 900-01 (Fla. 2001).  When that false or

- 23 -

incomplete testimony is created by the State, the defendant should be permitted, through cross-examination, to fill in the gaps, without being subject to impeachment as occurred in this case.

The Second District Court of Appeal, in *Foster v. State*, 182 So. 3d 3 (Fla. 2d DCA 2015), explained why fairness compels the opposite result of that reached by the majority:

> Generally, a defendant's out-of-court self-serving exculpatory statements are inadmissible hearsay. *Lott v. State*, 695 So. 2d 1239, 1243 (Fla. 1997). "[H]owever, where the state has 'opened the door' by eliciting testimony as to part of the conversation, [the] defendant is entitled to cross-examine the witness about other relevant statements made during the conversation." *Guerrero v. State*, 532 So. 2d 75, 76 (Fla. 3d DCA 1988). "The 'opening the door' concept is based on considerations of fairness and the truth-seeking function of a trial, where cross-examination reveals the whole story of a transaction only partly explained in direct examination." *Bozeman v. State*, 698 So. 2d 629, 631 (Fla. 4th DCA 1997).

*Id.* at 4.

Like the Second District, I would conclude that when the State omits material parts of the relevant interrogation, paraphrases, or presents inaccurate statements of a criminal defendant, the defendant is entitled to introduce, on cross-examination, any statement necessary to correct the misimpression, including exculpatory statements, without being subject to impeachment. In other words, the defendant should be able to provide context for any statements introduced.

- 24 -

However, the decision made by the trial court, affirmed by the Fourth District Court of Appeal and approved by this Court, was that if Nock wanted an accurate portrayal of his statements to the police he could be impeached with evidence of prior crimes even if he did not testify. Because this result is antithetical to the concept of fairness, upon which the principle of opening the door is based, and is not required by this Court's precedent, I dissent.

**FACTS**

The State's entire direct examination of the detective in this case was designed to further its theory of the crime. Instead of simply introducing the video of Nock's interrogation, the State chose to carefully introduce portions of Nock's interrogation through the testimony of the detective who was present in such a way as to create an illusion that the State's evidence proved that Nock committed premeditated first-degree murder. A very different impression of the interrogation is conveyed by the video of the complete interrogation. In an effort to correct the misimpression created by the State, the defense, on cross-examination, chronologically presented the interrogation and was able to elicit the proper context in which many of Nock's statements were made.

The State's presentation of Nock's interrogation was misleading in several critical ways. First, while questioning the detective on direct examination, the State presented the interrogation out of order. While it is true, as the detective

testified on direct examination, that Nock denied the crime for the first hour of the interrogation, it is also true, as was elicited on cross-examination, that after the first hour, Nock accepted responsibility for the crime, answered all of the detective's questions, and never changed his story that the death was an accident.

Second, the State paraphrased Nock's statements in the interrogation. For example, on direct examination, the detective testified that Nock stated: "It wasn't suppose[d] to happen this way." What Nock actually said in the interrogation was, "It wasn't suppose[d] to happen, he stopped breathing."

Third, the State presented only portions of the interrogation, randomly picking and choosing some of Nock's statements and divorcing them from their proper context. For example, with respect to Nock's description of how the victim died, the detective testified on direct examination that Nock explained how the victim died in the kitchen, and that he had already taken the victim's wallet and credit cards at the time of his death. However, on cross-examination, the detective conceded that Nock also explained that the victim's death was an accident, and then he demonstrated how the victim died. Additionally, the detective conceded on cross-examination that even though he pressed Nock multiple times in regard to the theory that the death was the result of a robbery gone bad, Nock consistently maintained throughout the interrogation that the death was an accident.

As another example, the detective testified on direct examination that when the victim stopped breathing while in a wrestling hold, Nock tried to awaken him after the victim dropped to the kitchen floor, but the victim did not respond. On cross-examination, the detective conceded that Nock actually said that he never intentionally hurt anyone and that he had not intended to hurt the victim. The detective also admitted that Nock told him that the victim "quit breathing on me" and the detective clarified that contrary to his direct examination testimony, Nock did not state that the victim passed out or lost consciousness.

With respect to the alleged robbery, the detective testified on direct examination that Nock told him that he grabbed the victim's laptop computer, car keys, and other items, not including his wallet and credit cards, after the victim died. On cross-examination, the detective admitted that, within the same part of the interrogation, Nock also stated that he took those items because the victim had died and he wanted to make the scene appear as though the items were taken in a robbery. Additionally, Nock stated that although he initially put a cord around the victim's neck, he removed it because he felt that it was wrong to put it there in the first place. In the same context, the detective pressed Nock on his use of the victim's credit cards and Nock replied that he was desperate and foolish and that his mind was elsewhere at the time.

- 27 -

With respect to the victim's home, on direct examination the detective testified that Nock told him he poured bleach on the kitchen floor to cover up his presence. On cross-examination, the detective admitted that during the same part of the interrogation, Nock also said that he panicked before he poured the bleach on the victim's floor because he did not know CPR and he checked but found that the victim did not have a pulse. Nock also stated that after pouring bleach on the floor, he talked to the victim for thirty minutes, knowing he was dead. Nock then contemplated suicide because the victim died on him.

Nock's defense attorney brought the State's misrepresentations to the trial judge's attention:

> I'm planning to cross examine Detective Rivera if the courts, and the Court has, I'm not quibbling with your ruling, you have denied my insistence that the statement be admitted to be charged to the State, that the State be charged of the proponent of the statement, a full recorded statement. I am going to cross examine Detective Rivera about things that he omitted from the statement that the State cherry picked deliberately of him, certain phrases and context. The context of the statement has been misrepresented, it's not accurate. The context is critical. So, I do intend to and I want to make it clear because it's very clear now because the Court's reminding me and the Court wants to inquire of Mr. Nock that if I do that, . . . that's going to open up Mr. Nock to being impeached. . . .
>
> . . . .
>
> . . . Mr. Nock has a right to counsel and he has a right to cross examination but that's gonna to come at a cost to Mr. Nock that that's going to be impeached and it's going to cost his fifth amendment right to remain silent . . . .

The trial court denied Nock's multiple requests to have the entire interrogation entered into evidence. Instead, the trial court held that if Nock wanted to introduce the entire interrogation to clarify the misimpressions made by the State, he could do so during his portion of the trial, but would be subject to impeachment. Specifically, the trial court held that any clarification of the interrogation by Nock that included exculpatory statements would lead to the court permitting the State to present evidence to the jury of Nock's nine prior felony convictions.

**ANALYSIS**

Today, the majority opinion approves the decision below, essentially permitting the State to force criminal defendants into the Hobson's choice of allowing their interrogation with police to be misstated and mischaracterized through the testimony of an interested party or divulging to the jury highly prejudicial information of their previous criminal convictions. However, I would approve *Foster*, which avoids this unnecessary and patently unfair result. In *Foster*, the Second District, under similar facts, held:

> Here, the record shows that it was the State that first elicited testimony from the officer that Foster said he found the wallet. Once the State presented a portion of Foster's statement, Foster was entitled to have the jury hear the remainder of his statement without fear of placing his credibility in issue. Thus, the trial court erred in finding that defense counsel's cross-examination of the officer opened the door to Foster's impeachment by prior convictions.

- 29 -

182 So. 3d at 4-5 (citation omitted).

The majority disapproves *Foster*, concluding that it is contrary to this Court's decision in *Kaczmar v. State*, 104 So. 3d 990 (Fla. 2012), and "did not address the reasoning of *Huggins* [*v. State*, 889 So. 2d 743 (Fla. 2004)], which clearly laid a foundation for *Kaczmar*." Majority op. at 21. However, the majority fails to acknowledge that there is a significant distinction between this case and *Foster* and this Court's opinions in *Huggins* and *Kaczmar*.

In *Kaczmar*, the State played an edited version of recorded conversations between the defendant and an undercover detective in regard to the defendant framing an innocent person for the murder. 104 So. 3d at 1000. This Court concluded that "in response to the State's warning that introducing the exculpatory statements would open the door to Kaczmar's prior felonies, defense counsel chose not to invoke the rule of completeness. Accordingly, the trial court did not abuse its discretion in allowing the State to introduce the edited version of the recordings." *Id.* at 1001.

Critical to this case is that there is no indication in *Kaczmar* that the State attempted to either play the recording out of order or take Kaczmar's statements out of context. Indeed, the actual recorded conversation, albeit an edited version, was played for the jury. *Id.* Therefore, the jury in *Kaczmar*, as opposed to this case, was able to follow the conversation in the order in which it occurred and

listen to the statements that were actually made by the parties, rather than one participant's recollection of the statements. Thus, the fairness concerns that are present in this case were not present in *Kaczmar*.

*Huggins* is likewise distinguishable from this case. There, the defendant himself introduced the exculpatory testimony of a corrections officer in an attempt to counter evidence presented by the State. 889 So. 2d at 755. The testimony was presented in response to evidence entered by the State of his consciousness of guilt. *Id.* However, nowhere in the opinion is there any indication that the State presented an inaccurate or misleading portrayal of the evidence. Thus, Huggins made the choice to elicit the exculpatory information in an effort to help his defense, and was not forced to do so in an effort to clarify misrepresentations made by the State.

By contrast, in this case, the State inaccurately portrayed Nock's interrogation and eventual confession to the crime, presenting the interrogation piecemeal and out of order and paraphrasing some of Nock's statements. Similarly, in *Foster*, the State elicited only a portion of Foster's statement to the police on direct examination, requiring Foster to introduce the other relevant portions of his statement in order to clarify the State's portrayal of his statements. 182 So. 3d at 5.

Accordingly, contrary to the majority's reasoning, *Huggins* and *Kaczmar* do not mandate the conclusion in this case. The highly inequitable result in this case is a direct product of this distinguishing factor between the two sets of cases and compels this Court to apply the concept of "opening the door" here, as was done in *Foster*. Thus, this Court should require that when one party introduces an interrogation in a way that is incomplete and misleading, it opens the door to allowing the other party to introduce an accurate depiction of the conversation, even if doing so includes exculpatory statements. As the majority opinion aptly explains:

> "As an evidentiary principle, the concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted." *Ramirez* [*v. State*], 739 So. 2d [568,] 579 [(Fla. 1999)] (quoting *Tompkins v. State*, 502 So. 2d 415, 419 (Fla. 1986)). "The concept of 'opening the door' is 'based on considerations of fairness and the truth-seeking function of a trial.' " *Id.* (quoting *Bozeman v. State*, 698 So. 2d 629, 631 (Fla. 4th DCA 1997)); *see McCrae v. State*, 395 So. 2d 1145, 1151-52 (Fla. 1980) (holding that a prosecutor was entitled to inquire into the exact nature of a prior felony conviction where defense counsel sought to establish that that prior conviction was inconsequential). The concept of "opening the door" is also based on "the consideration that without the fuller explication, the testimony that opened the door would be 'incomplete and misleading.' " *Peterson v. State*, 94 So. 3d 514, 534 (Fla. 2012) (quoting *Lawrence v. State*, 846 So. 2d 440, 452 (Fla. 2003)); *see Overton v. State*, 801 So. 2d 877, 900-01 (Fla. 2001) (agreeing that the State is permitted to fill in the gaps in the testimony to correct a false impression left by the defendant). Similarly, the statutory rule of completeness is based on considerations of "fairness" and "avoid[ing] the potential for creating misleading impressions by taking statements out of context."

*Larzelere* [*v. State*], 676 So. 2d [394,] 401-02 [(Fla. 1996)] (quoting Charles W. Ehrhardt, *Florida Evidence* §108.1 (1995 ed.)).

Majority op. at 17-18.

Fairness and the need to cure the misleading impression left by the testimony presented by the State required that Nock be allowed to introduce an accurate portrayal of his interrogation. Moreover, because the State's actions placed Nock in an untenable position to clarify its numerous and calculated misrepresentations, Nock should not be penalized by being subject to impeachment. Thus, I would conclude that the trial court erred in allowing evidence of Nock's nine prior felony convictions to be introduced at trial.

Additionally, I would conclude that the error in this case was not harmless beyond a reasonable doubt. As the Second District held in *Foster*, "Because this case turned on [the defendant's] credibility and whether the jury believed [his version of the crime], we cannot say beyond a reasonable doubt that allowing the jury to learn of his prior criminal record did not contribute to the verdict." 182 So. 3d at 5; *see also State v. DiGuilio*, 491 So. 2d 1129, 1134 (Fla. 1986).

## CONCLUSION

At the heart of this case is the concept of fairness, which is the basis for the principle of opening the door. Nock should not be forced to correct the State's misimpression of his interrogation at the cost of being impeached by highly prejudicial evidence of prior felony convictions. Thus, I would conclude that the

- 33 -

trial court erred when it permitted the State to introduce evidence of Nock's prior felony convictions. Further, because I conclude that the error is not harmless, I would reverse and remand for a new trial.

Accordingly, I dissent.

QUINCE, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

      Fourth District - Case No. 4D14-1240

      (Broward County)

Carey Haughwout, Public Defender, and Ian Seldin, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida,

      for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Celia Terenzio, Bureau Chief, and Don M. Rogers, Assistant Attorney General, West Palm Beach, Florida,

      for Respondent