763 So.2d 1114 (1999)
Frank Sheldon GELDREICH, Appellant,
v.
STATE of Florida, Appellee.
No. 98-1091.
District Court of Appeal of Florida, Fourth District.
December 22, 1999.
*1115 Richard L. Jorandby, Public Defender, Anthony Calvello and Margaret Good-Earnest, Assistant Public Defenders, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, Douglas Gurnic and Consuelo Maingot, Assistant Attorneys General, Fort Lauderdale, for appellee.
WARNER, C.J.
Appellant, Frank Geldreich, appeals from two separate convictions and sentences after two jury trials. In the first trial, he was found guilty of three counts of sexual battery with force, one count of sexual battery with a threat, and kidnapping of victim G.F. In the second trial, he was found guilty of attempted sexual battery with force, and kidnapping of victim K.B., along with possession of cocaine, in an incident which occurred the day after that involving G.F. In each case, the facts of the other crime were admitted into evidence over appellant's objection. Geldreich raises three significant issues: 1) that it was error to admit each incident as collateral crimes in the trial of the other; 2) that it was error not to sever the possession of cocaine charge from the charge of attempted sexual battery; and 3) that the state failed to prove that he engaged in an overt act sufficient to support his conviction for attempted sexual battery. We hold that it was not error to admit the collateral crime evidence nor was there any error in denying judgment of acquittal on the charge of attempted sexual battery. However, we find that reversible error occurred in joining the cocaine charge with the sexual battery charge.

I. Incident with G.F.
On New Year's Eve, 1997, G.F., a blonde haired woman in her late 40's, went to Chuck & Harold's where her daughter worked. She sat at the bar with her daughter's boyfriend when Geldreich approached her and introduced himself to her as a friend of her daughter. After conversing for a while, Geldreich convinced G.F. to accompany him to another restaurant. At that restaurant, Geldreich ordered drinks for both of them, but G.F. refused any alcohol. Shortly thereafter, Geldreich invited G.F. to go to another bar, which she agreed to do.
Instead of going to a bar, Geldreich led G.F. to his apartment which was close to Chuck & Harold's. Once inside, he disappeared into another room. When he returned, he was carrying a small bag of white powder which he said would sexually enhance her. When she inquired as to the contents, he admitted that it was cocaine. G.F. told him that she did not do drugs, and again he told her that the drugs would enhance her sexually. At that point, G.F. tried to leave but was grabbed by Geldreich. She began screaming and struggling with him. He then hit her on the head several times, dragged her across the floor, and threw her onto the bed. Once there, he began to choke her, told her he would rip her throat out, and that he would throw her in the canal where no one would find her. He then began to take her clothes off and sexually assaulted her. After the first sexual assault, she tried to leave. Again he grabbed her, threw her around and once more sexually assaulted her. When she refused another demand for sex, he struck her in the head and sexually assaulted her for a third time, eventually falling asleep after the assault. While he was asleep, G.F. could not escape because every time she moved he would wake up.
Upon arising early in the morning, Geldreich left the apartment briefly to call G.F.'s daughter to tell her that her mother was all right. When he left, G.F. heard the keys and assumed that she was locked in. She did not try to leave. When he returned, he sexually assaulted her once again. G.F. then told him that her head was aching and he offered to go to the store to get some aspirin. While he was gone, she did not try to leave because she said she was scared. Geldreich returned *1116 but then left again, stating that he needed to move her car. When he left this third time, G.F. checked the door and finding it unlocked, gathered up her belongings, and ran down the hallway to a neighbor's door, where she begged entry. The neighbor let her in and called the police.
When contacted by the police and told of the allegations by G.F., Geldreich laughed and said "a 49 year old woman, 30 year old good looking guy, oh my God, no jury in the world would believe this." Contrary to G.F.'s account, he stated that G.F. was drunk, the sex between G.F. and him was consensual, and that G.F.'s noticeable injuries were caused by her slipping in the shower. The police taped this conversation.

II. Incident with K.B.
The second incident took place on the night following the incident with G.F. On January 2, 1997, K.B., also a blonde haired woman in her 40's, met Geldreich at Bradley's, another Palm Beach bar. She was introduced to him by a friend. While talking with him, he attempted to sit on the bar stool with her. To get away, she slipped into the bathroom. When she exited the bathroom, he was standing two feet away from the door where he began complaining to her about the bar noise. He grabbed her by the hand in an attempt to get her to leave with him. Because K.B. had been introduced to Geldreich by her friend, she voluntarily went with him to see what he had to say.
Once outside he asked her to go to his apartment, but K.B. declined. He then told her that he had some "good stuff" back at his apartment. K.B. told him that she did not do "stuff" and did not want to go to his apartment. Geldreich then forcibly picked her up and carried her to a parking lot. She managed to get loose, but he grabbed her arm. He threw her to the ground, causing her to hit her head and scrape her knee. Geldreich flipped her over, straddled her, and began removing her shirt. To get out from under him, she told him she would go to his apartment. At that point, the bar doorman, who had heard K.B. screaming, came up to ask if everything was okay. Geldreich responded that K.B. was drunk and had fallen down. K.B., on the other hand, told the doorman that Geldreich was trying to rape her. Geldreich then fled. Soon after, Geldreich was charged with attempted sexual battery with force, kidnapping, and possession of cocaine, which was found upon a search of Geldreich's apartment.
Geldreich gave a statement to the police regarding the K.B. incident. According to Geldreich, they were both drunk, and when he carried her to the parking lot, both were laughing. He and K.B. then began to kiss and "mess around." When the doorman approached them, K.B. "freaked out" and said "no." As to K.B.'s injuries, Geldreich explained that she might have suffered them after falling.
Each incident was tried separately, but the state filed notices of intent to introduce the K.B. incident in the G.F. trial and the G.F. incident in K.B.'s trial. Over objection, the court permitted the collateral crime evidence to be introduced. In the G.F. case, the testimony of K.B., the doorman, and the tape of Geldreich describing the K.B. incident were introduced. In the K.B. case, G.F. testified about her assault by Geldreich.

III. Analysis: Collateral Crimes.
We begin our analysis by repeating the standard of review of evidentiary decisions of the trial court. "[T]he admissibility of evidence is a matter within the wide discretion of the trial court, and in the absence of an abuse of discretion, the trial court's ruling on admissibility will not be overturned." McMann v. State, 698 So.2d 386, 387 (Fla. 4th DCA 1997). This same abuse of discretion standard applies to review of Williams rule evidence. See Chandler v. State, 702 So.2d 186, 195 (Fla. 1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998); Traina v. *1117 State, 657 So.2d 1227, 1229 (Fla. 4th DCA 1995).
Section 90.404(2)(a), Florida Statutes (1997) provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
See also Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). However, evidence of other crimes may be admissible, even if not similar, to prove a material fact at issue. Williams v. State, 621 So.2d 413, 414-15 (Fla.1993) states:
Although similarity is not a requirement for admission of other crime evidence, when the fact to be proven is, for example, identity or common plan or scheme it is generally the similarity between the charged offense and the other crime or act that gives the evidence probative value. Thus, evidence of other crimes, whether factually similar or dissimilar to the charged crime, is admissible if the evidence is relevant to prove a matter of consequence other than bad character or propensity.
. . . .
Similar fact evidence has been held admissible in sexual battery cases when the evidence was found to have a logical relationship to some material aspect of the charged crime beyond the character of the defendant or his propensity to force himself on women.
(citations omitted).
In Williams the collateral crime evidence was admitted to rebut the defense of consent put forth by the defendant. Arguing that consent was something unique to each individual, Williams claimed that the collateral incidents could not be probative of the victim's consent in the charged crime. Thus, the collateral incidents only proved bad character or propensity. While the supreme court agreed that collateral crimes could not constitute evidence showing non-consent, such evidence could nevertheless be relevant to the issue by showing, for instance, a common plan or scheme of a defendant to seek out women who might be unlikely to complain of an assault. See id. at 417. The court cited with approval to People v. Oliphant, 399 Mich. 472, 250 N.W.2d 443 (1976), in which the Michigan Supreme Court approved the admission of collateral sexual assaults to show a common scheme or design to orchestrate the assault in a manner and under circumstances which would give the appearance of consent should the defendant meet with resistance.
Similarly, in the instant case, the collateral evidence was used to show a common plan or a design to create circumstances that would give the appearance of consent by the victims. See id. There are various points of similarity between the two incidents giving rise to this common plan and to give the appearance of consent: 1) both incidents occurred within the space of twenty-four hours and at night; 2) both victims had blonde hair and were in their forties; 3) both were at Palm Beach bars located close to each other, at the time they were introduced to Geldreich by mutual acquaintances; 4) Geldreich asked both to leave the bar with him under circumstances which would make their being with him appear voluntary; 5) both women were offered drugs or "stuff;" 6) Geldreich's intent was to get both women into his apartment; 7) both incidents involved physical violence when the women refused his advances; and 8) in each case, when questioned by police, Geldreich claimed both women were drunk, that the sexual overtures were consensual, and the women received their injuries accidentally. Thus, a jury could conclude that Geldreich's common scheme was to pick up older women at bars, and to try to get them to accompany him to his apartment for the *1118 purpose of sexual intercourse. Meeting them at bars was important to the scheme, because he could claim that the victims were drunk and consented to his advances. All of this evidence was relevant to showing a common scheme or design, which would give the appearance of consent, even though consent was lacking.
Of course, there are dissimilarities between the two, the most apparent being the fact that G.F. voluntarily accompanied Geldreich to his apartment while K.B. did not, and K.B.'s attack took place in the parking lot of the bar. However, as in Gore v. State, 599 So.2d 978, 983 (Fla.), cert. denied, 506 U.S. 1003, 113 S.Ct. 610, 121 L.Ed.2d 545 (1992), the dissimilarities appear more a difference in opportunity rather than a different modus operandi. Based upon a thorough review of the evidence presented and the law, we conclude that the trial court did not abuse its wide discretion in determining that the two crimes had sufficient similarities to be admissible to rebut the defense by showing an orchestrated attempt to give the appearance of consent.
In addition to showing a common scheme or design to orchestrate the appearance of consent, the G.F. incident was admissible in the K.B. trial to show Geldreich's intent to sexually assault K.B. See id.; Chandler, 702 So.2d at 186. The similarities between the two incidents were sufficient to prove Geldreich's intent in grabbing K.B. and assaulting her.
For the foregoing reasons we affirm the conviction and sentence for the G.F. incident.

IV. Severance of Possession of Cocaine from Attempted Sexual Battery.
Geldreich also complains that the court should have severed the charge of possession of cocaine from the attempted sexual battery of K.B. We agree that it was error for the trial court not to have severed the two offenses, as they were not based upon the same act or transaction. See Fla. R.Crim. P. 3.151. They were not part of a crime "spree," see Ellis v. State, 622 So.2d 991, 1000 (Fla.1993), and the crimes were not related to each other. See Dupree v. State, 705 So.2d 90, 95 (Fla. 4th DCA), cause dismissed, 725 So.2d 1107 (Fla.1998). Although K.B. testified that Geldreich offered her "stuff," she did not know what kind of "stuff" he meant. In addition, that was the closest conceivable connection to any mention of drugs in this case and is thus insufficient to justify joinder. We cannot say that the joinder of the two charges was not harmful to the outcome. The evidence was conflicting as to whether the incident was consensual. The bar doorman testified that he saw K.B. and Geldreich kissing and hugging. The accusation that Geldreich was involved in other unrelated illegal behavior could tend to tip the scales in proving the attempted sexual battery. See Crossley v. State, 596 So.2d 447, 450 (Fla.1992). We therefore reverse the convictions for attempted sexual battery of K.B. and possession of cocaine and remand for separate trials on each charge.

V. Judgment of Acquittal on Attempted Sexual Battery.
Finally, Geldreich complains that the state failed to prove that he engaged in an overt act towards the commission of sexual battery, and thus his motion for judgment of acquittal should have been granted. Two necessary elements establish an attempt to commit a crime: "a specific intent to commit a particular crime, and an overt act toward its commission." State v. Walker, 705 So.2d 589, 591 (Fla. 4th DCA), rev. denied, 718 So.2d 173 (Fla.1998). "The intent and the act must be such that they would have resulted, except for the interference of some cause preventing the carrying out of the intent, in the completed commission of the crime." L.J. v. State, 421 So.2d 198, 198-99 (Fla. 3d DCA 1982). Thus, the act must go beyond mere preparation and planning. See Walker, 705 So.2d at 590.
*1119 The facts of this case show both an intent and acts in furtherance of its commission. Geldreich forcibly carried K.B. to the parking lot, threw her down, straddled her, and began to take her blouse off. During that time, K.B. was screaming. Unlike Rogers v. State, 660 So.2d 237, 241 (Fla.1995), where the defendant ceased his sexual advances when the victim asked him to stop, Geldreich forcibly continued his assault. These constitute sufficient overt acts to support the denial of the judgment of acquittal on the attempted sexual battery charge.
We affirm without further discussion of the remaining point raised as to jury selection.
Affirmed in part; reversed in part.
STONE, J., and COX, CYNTHIA L., Associate Judge, concur.