DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GARY TIMOTHY KITCHINGS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-1929

[February 12, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Krista Marx, Judge; L.T. Case No. 50-2017-CF-004538-A.

Ashley Litwin and Marc David Seitles of Seitles & Litwin, P.A., Miami, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Alexandra A. Folley, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Gary Kitchings appeals his conviction and sentence for three counts of sexual battery, one count of burglary, and one count of false imprisonment.

On the night of the criminal incidents, Kitchings was a 57-year-old Uber driver with no prior exposure to the justice system other than speeding tickets. His accuser, M.R., was a mid-thirties woman who entered Kitchings' car as an Uber passenger. The incidents forming the basis of the criminal charges occurred in Kitchings' car and in M.R.'s condominium. Kitchings' defense at trial was that his sexual contact with M.R. was consensual.

We reverse, for two reasons. First, the trial court improperly refused to allow the defense to introduce Kitchings' initial statement to the police to rebut an implied charge of recent fabrication. Second, the court improperly admitted the entirety of one of M.R.'s previous statements into evidence.

# Trial Testimony—The State's Case

*M.R.'s testimony*

M.R. splits her time between Florida and New York. After attending a Sunfest concert, she went for drinks with friends before booking an Uber pool to take her home. She took a screenshot of the car when she booked it, as was her usual practice.

When Kitchings pulled up, no one else was in the car, so M.R. sat in the back. A few minutes later, they picked up two more passengers, so she moved to the front seat. The other passengers were in the car for about 15 minutes before they were dropped off.

M.R. testified that as soon as they got on I-95, Kitchings started hitting on her, saying things like, "I was watching you from the moment that you walked up to the car. I saw how beautiful and sexy you looked. You must have gotten hit on by so many guys at Sunfest." She did not like the way the conversation was going, so she tried to ignore him by looking at pictures on her phone.

During the drive, Kitchings tried to touch M.R. between her legs, ripping her pantyhose in the process, but M.R. pulled his hand away. He then grabbed her left hand and put it on his pants, but she pulled her hand away. Kitchings unzipped his pants and pulled them down. He took M.R.'s hand and put it on his now-exposed penis. M.R. unbuckled her seat belt and pulled the door handle to try and jump out of the car, but the door was locked. Kitchings told her that he had a gun under the seat and threatened to shoot her if she did not do what he said. M.R. never saw a gun that evening, but she believed there was a chance that he had a gun under his seat.

Kitchings told M.R. to refasten her seat belt. He said he wanted her to "suck [him]." He then pushed M.R.'s head down on top of his penis while she pleaded, "Please, no, I don't really want to do this." After more protests, she performed oral sex on Kitchings. He told M.R. that he was going to urinate in her mouth and that he wanted her to swallow it, which she did. When M.R. tried to lift her head back up, Kitchings pushed it back down and stated that he was going to ejaculate in her mouth and he wanted her to swallow it, which she did.

When they arrived at her neighborhood, M.R. told Kitchings to let her off at the unoccupied guard gate, but he insisted on driving her home. M.R. guided him to the quadplex where she lived. Once he stopped the car, M.R. ran to her door and opened it. When she turned around to close the door, Kitchings was right there. He pushed her inside and closed the

door while M.R. screamed for help. She thought Kitchings was holding something under his shirt, but she did not see what it was. M.R.'s dogs were barking. Kitchings threatened to kill her and her dogs if she did not do what he said. He said, "We're going to your bedroom," and M.R. led him there.

In M.R.'s bedroom, Kitchings told her to take off her shoes. She complied. He removed his pants and underwear, pushed M.R. down on the bed, aggressively grabbed her thighs, and ripped off her pantyhose. He then ordered M.R. to stand up so he could remove her dress. She complied. When M.R. was fully undressed, he pushed her back onto the bed, got on top of her, and penetrated her vaginally with his penis while digitally penetrating her anus. He then put his penis in her mouth. Next, he penetrated her in the anus while digitally penetrating her vagina. Kitchings was not wearing a condom and he ejaculated in her vagina. During the entire incident, M.R. pleaded with him to leave and told him that she did not want this.

After the assault, Kitchings got dressed and M.R. heard the door slam as he left. Then, she locked the door, grabbed her cellphone, ran into her closet and called 911. The 911 call was played for the jury. The police arrived and took her to the hospital. Afterwards, she went to the Butterfly House where a rape kit was collected.

The State introduced photographs taken of M.R. at the Butterfly House showing bruising on her arm, which she attributed to being grabbed by Kitchings. The State also introduced photographs taken of M.R. two days after the incident by her friend in New York. These photos depicted bruising on her arm as well as bruising on her left thigh, which M.R. stated were caused by Kitchings when he held her down in her bedroom.

On cross-examination, the defense noted that there were no photographs from the Butterfly House of bruising on M.R.'s thigh, even though M.R. stated that the nurse took pictures of it. The defense further pointed out that M.R. did not tell the detective that she had bruising on her thigh when he explicitly asked her during her Butterfly House interview if she had any bruises other than the bruising on her arm. Defense counsel highlighted the inconsistency between M.R.'s follow-up interview with the detective, where she stated that the bruises on her leg were caused by Kitchings when he grabbed her in the car, and her trial testimony, where she indicated the bruises were caused by Kitchings holding her down during sex. M.R. clarified that the bruises came from both instances, despite acknowledging that Kitchings probably would not have grabbed her in the exact same spot.

*The Mother/Daughter Uber Passengers*

The mother and daughter, who were in the car with M.R. before being dropped off, testified at trial. The daughter testified that during their ride, M.R. mentioned that she was sad to be going home by herself. The mother said that M.R. was talking a lot to Kitchings and saying that she was going back home by herself.

*M.R.'s neighbor*

M.R.'s neighbor in the adjacent quadplex testified that she was home on the night of the incident and woke up around 1 a.m. when she heard two car doors slam, but then went back to sleep. She did not hear anybody screaming or dogs barking when she woke up and did not notice any police activity later that night. The next morning, she observed that M.R. was hysterical when she saw her leaving with a police officer.

*Responding Jupiter Police Officer*

A Jupiter police officer first responded to a sexual battery call at about 2:10 a.m. When she arrived at the scene, she noticed that M.R. appeared distraught and was pacing back and forth, sometimes crying, and cleaning up dog feces. M.R. told the responding officer that an Uber driver inserted his finger into her vagina and anus while they were in the car, but she did not tell the officer about performing oral sex in the car. M.R. said she was yelling for help and screaming from the time she opened the car door to the time she got to her front door. M.R. also asserted that her assailant urinated in her mouth while she was performing oral sex on him in her bedroom.

The officer took M.R. to the hospital where she collected M.R.'s dress and pantyhose for evidence. She turned these items over to a crime scene investigator for the Jupiter police department.

*Jupiter Crime Scene Investigator*

The CSI testified that there was a hole in the crotch area of M.R.'s pantyhose and that the soles of the pantyhose were all black as if they were well worn. There was a stain on the dress, but M.R. testified earlier that the stain was from the Kombucha tea she was drinking and had nothing to do with the case.

She processed Kitchings' car and testified there was a stain on the passenger seat, but it was on the backing. There was nothing on the driver's side or center console. She did not smell any "cleaning smell" or note that that the car had just been meticulously cleaned. She discovered

a blue container tucked behind the liner inside the trunk of the car that contained a lubricant and condoms.

*Sexual Assault Nurse*

A sexual assault nurse for Palm Beach County testified that she examined M.R. at the Butterfly House and took oral, vaginal, and anal swabs. She observed that M.R. had a bruise on her arm and some scratches, which she photographed. She observed no injuries in M.R.'s mouth or her vagina. There was no vaginal bleeding and no sign of injuries to the anus. M.R. did not complain of any pain during her exam, but stated there was pain during the assault.

On cross-examination, the nurse stated that M.R. never told her that she had injuries on her legs and she did not personally observe any markings or injuries on M.R.'s legs.

*M.R.'s New York friend*

M.R.'s New York friend testified that just after midnight, she received a call from M.R. who said she was raped. M.R. was crying and not acting like herself. The friend immediately got on the computer to look at flights, and ultimately arranged a flight for M.R. to come home to New York that same day.

When the friend picked M.R. up at the airport, she did not observe any injuries on her, but she indicated that M.R. did not look like her usual self. She stayed with M.R. for a few days. She noticed a bruise on M.R.'s upper arm and on the upper part of her leg between her knee and her hip, which she photographed at the Jupiter detective's request.

*The Jupiter Detective*

The Jupiter detective testified that he received a call around 2:30 a.m. and responded to the Jupiter Medical Center. He observed that M.R.'s demeanor was very quiet. During M.R.'s time at the hospital, she was making phone calls to her friend.

The detective took M.R. to the Butterfly House and interviewed her after her rape kit was collected. The recorded interview occurred at about 7:40 a.m., about 5 ½ hours after the 911 call came in. After the interview, he brought M.R. back to the Jupiter Police Department where he conducted a video-recorded follow-up interview. The detective then took M.R. back to her residence and later transported her to the airport.

When M.R. was back in New York, the detective conducted a clarification interview with her over the phone. He testified that M.R.'s

story had not changed between the first interview and the follow-up interview.

The detective put Kitchings under surveillance and he was arrested about 36 hours after the 911 call. The detective interviewed Kitchings for about two hours. The detective testified that M.R.'s Uber ride started at 12:34 a.m. and ended at 1:17 a.m. Kitchings completed two more Uber fares afterwards, from 2:34 to 3:47 a.m. and 4:26 to 4:55 a.m., before arriving home around 5:00 a.m.

On cross-examination, the detective stated that no firearm was found in the car and there was no evidence showing that there was a gun in Kitchings' house. On redirect, he indicated that he saw multiple pictures of Kitchings with a gun on Facebook.

*Palm Beach County Sheriff's Office Forensic Scientist*

A forensic scientist processed M.R.'s rape kit. The oral swabs were negative for seminal fluid and the scientist was unable to identify any sperm cells. The vaginal, cervical, and labia swabs all tested positive for seminal fluid. The anal swabs tested positive for seminal fluid, but the scientist was unable to identify sperm cells. She did identify sperm cells on the perianal swabs.

The scientist also tested swabs from the fitted sheet from M.R.'s bedroom, which tested negative for blood and semen. She was never given M.R.'s dress or pantyhose to test.

*DNA Forensic Scientist*

A senior forensic scientist for the Palm Beach County Sheriff's Office performed a DNA analysis on the swabs. Regarding the vaginal swabs, there were two contributors of DNA for the non-sperm fraction. She identified M.R. as one contributor, but could not determine the second contributor based on the limited information. For the sperm fraction of the vaginal swabs, Kitchings could not be excluded as a contributor. Kitchings also could not be excluded as a contributor to the sperm fraction of the perianal and anal swabs.

**Trial Testimony—The Defense Case**

*Defendant Gary Kitchings*

Kitchings took the witness stand in his defense. He testified that after he dropped off the mother and daughter, M.R. became flirtatious, leaning over and telling him, "Wow, you look really great for your age." He stated that this caught his attention because he thought a young lady might be interested in him. M.R. asked him if he was married and he told her he

has been married for over 30 years. M.R. bumped Kitchings with her elbow in a playful way and asked him if he cheats. He testified that when she asked this question, he thought, "this is headed towards sex."

M.R. told Kitchings that her boyfriend had dumped her and that she hadn't had sex in over a year. Kitchings responded, "Well whose fault is that," and told her that if she was interested in sex, all she had to do was head to Clematis Street and there would be all kinds of guys that would be willing participants because "that's what they go down there for."

M.R. asked Kitchings if he would be interested in coming inside once they got to her place. He told her to "just go to Clematis and you can . . . pick up guys there; guys don't say no." M.R. asked, "Well, what about you; when we get to my place would you like to come in," to which Kitchings responded, "Well, if you asked me in I wouldn't say no."

M.R. put her hand on Kitchings' knee and rubbed his inner thigh back and forth and fondled his hair. When they arrived at M.R.'s house he said, "So are you going to invite me in" and M.R. said "yes." M.R. invited him into the house and he was under the impression that they were going to have sex. She unlocked the door and apologized for her dogs.

M.R. led Kitchings to her bedroom. M.R. pulled her dress up around her waist and pulled her pantyhose down below her knees before she laid down on the bed and started "kicking her feet like she was riding a bicycle and giggled." Kitchings reached for her pantyhose and pulled them. M.R. stated that she hadn't had sex in awhile and that she was "okay," meaning "disease-free." She asked if Kitchings had any relationships where he did not use a condom. He declared he was "disease-free."

Kitchings took off his glasses, kneeled on the ground, and started performing oral sex on M.R. At some point, he stopped and undressed before continuing to perform oral sex. M.R. nudged Kitchings to swap positions and she began performing oral sex on him.

Kitchings testified that he suffers from hypertension and cardiovascular disease, and has several stents in his heart, so it is a challenge for him to get an erection. It took him about 10-15 minutes to get an erection and, when he did, he nudged M.R. to indicate that it was "time to engage in intercourse." They had missionary position sex for about 5 to 10 minutes at most. Kitchings stimulated M.R. anally and there was some minor penetration. He ejaculated in M.R.'s vagina while in the missionary position.

Kitchings told M.R. that he had to go back to work, so he got dressed. M.R. asked how she could get in touch with him again sometime. Kitchings asked for a piece of paper and a pencil and told her he would

give her his number.  He wrote his information on the paper and said, "Okay, sweetie, I've got to go."  He said goodnight and told her to lock the door after he left.  Kitchings testified that the ride ended around 1:17 a.m. and he was in M.R.'s house between 20-30 minutes.  After he left her house, he completed two more Uber fares and arrived home around 5 a.m.

## Verdict and Sentence

The jury found Kitchings guilty of burglary, false imprisonment, and three of the four counts of sexual battery (deadly weapon/physical force).  The jury acquitted him of any sexual battery that occurred in the car.  The trial court sentenced Kitchings to 22 years for the sexual battery counts and burglary count and to five years on the false imprisonment count, to run concurrent with his 22-year sentence.

### *The trial court erred by excluding Kitchings' statement to the police given shortly after his arrest because it was admissible to rebut an implied charge of recent fabrication under section 90.801(2)(b), Florida Statutes*

After Kitchings was arrested, he spoke to the police during a recorded interview that lasted over 2 ½ hours.  In his statement to the police, he repeatedly denied the sexual assault allegations and maintained that he had consensual sex with M.R.  He offered to submit to a polygraph test over a dozen times to prove his innocence.  While he acknowledged that he made a mistake by cheating on his wife, he was adamant that he did not commit a crime.  Even when the detective told him that his story made "zero sense," Kitchings stated, "That may be true, but that doesn't stop it from being the truth."

The state did not offer a transcript or recording of the police interview into evidence.

At trial, the state opened its cross-examination of Kitchings by asking the following:

> Q: You've had the opportunity to sit in the courtroom the whole time, right?
>
> A: Yes.
>
> Q: Listen to all of the testimony?
>
> A: Yes.
>
> Q: Every single witness?
>
> A: Sure.

- 8 -

Q: You've got to look -- you've looked at every single exhibit?

A: From a distance but yes.

Q: You have heard all of the scientific evidence?

A: Yes.

During the remainder of cross-examination, the State focused on inconsistencies between Kitchings' police interview and his trial testimony. Much of the cross-examination employed four techniques which had the capacity to mislead the jury. First, the prosecutor pulled words out of context from the statement to the police in a way that changed their meaning; defense counsel addressed some of this misdirection on redirect examination. Second, the prosecutor mischaracterized what was said in the statement to the police to make it appear that there was a conflict with in-court testimony. Third, the prosecutor suggested facts not in evidence which were contrary to what Kitchings had said in his statement to the police. For example, the prosecutor attempted to imply that Kitchings had taken drugs for erectile disfunction when, in fact, the statement to the police said the opposite. Fourth, the prosecutor impeached Kitchings for matters in his trial testimony that were omitted from the statement to the police.

On redirect examination, defense counsel sought to introduce Kitchings' entire statement to the police based on the rule of completeness, the State opening the door, and as a prior consistent statement. The trial court denied the motion. Defense counsel later sought to admit the interview to rebut the State's implication of recent fabrication based on Kitchings "ha[ving] the opportunity to see all of the things in court." The trial court denied the motion.

We first address Kitchings' argument that his entire statement to the police was admissible under the rule of completeness because "the state brought out only the incriminating parts of [his] statement" and the "rest of the statement would have put all those supposed incriminating statements in context, so the jury could hear they were not actually incriminating."

The statutory rule of completeness is codified in section 90.108(1), Florida Statutes (2018), which states:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be

considered contemporaneously. An adverse party is not bound by evidence introduced under this section.

The purpose of the rule "is to avoid the potential for creating misleading impressions by taking statements out of context." *Schwartzberg v. State*, 215 So. 3d 611, 615 (Fla. 4th DCA 2017) (quoting *Larzelere v. State*, 676 So. 2d 394, 401 (Fla. 1996)). "This rule is not absolute, and 'the correct standard is whether, in the interest of fairness, the remaining portions of the statements should have been contemporaneously provided to the jury.'" *Ramirez v. State*, 739 So. 2d 568, 580 (Fla. 1999) (quoting *Larzelere*, 676 So. 2d at 402). However, the rule "does not apply unless a written or recorded statement is introduced into evidence." *Nock v. State*, 256 So. 3d 828, 830 (Fla. 2018).

In *Nock,* the Florida Supreme Court narrowly construed section 90.108(1). *Id.* The defendant in *Nock* had given a custodial statement to the police which was videotaped. *Id.* at 831. At trial, the state did not introduce the videotape into evidence; instead, the State called the arresting detective to testify about the statement. *Id.* Nock sought to admit the entire videotape under the rule of completeness. *Id.* Focusing on the statutory language--"[w]hen a writing or recorded statement or part thereof is introduced by a party"--the Supreme Court held that the rule of completeness was inapplicable to admit the entire videotape "because the State never introduced any portion of the recording into evidence." *Id.* at 836. The court observed that under the "court's precedent applying the common law rule of completeness . . . Nock was entitled to introduce the exculpatory portions of Nock's statement to the police and other relevant portions of the statement on cross-examination of the detective." *Id.*

This case is similar to *Nock* in that the State did not introduce Kitchings' statement to the police into evidence. For this reason, the rule of completeness did not compel the admission of the entire recorded statement at trial.

Although not admissible under the rule of completeness, the statement to the police was admissible under section 90.801(2)(b), Florida Statutes as a prior consistent statement offered to rebut an express or implied charge of recent fabrication. Section 90.801(2)(b) provides in pertinent part:

> (2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:

> \* \* \*

- 10 -

(b) Consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication . . . .

"Prior consistent statements are generally inadmissible to corroborate or bolster a witness's trial testimony, because such statements are usually hearsay." *Peterson v. State*, 874 So. 2d 14, 16 (Fla. 4th DCA 2004). However, under section 90.801(2)(b), prior consistent statements are not hearsay and can be used as substantive evidence if the declarant testifies at trial, is subject to cross-examination regarding the prior statement, and the statement is offered to rebut an express or implied charge of improper influence, motive, or recent fabrication. § 90.801(2)(b), Fla. Stat. (2018). This exception applies only "where the prior consistent statement was made prior to the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify." *Carter v. State*, 115 So. 3d 1031, 1035 (Fla. 4th DCA 2013) (citation and internal quotation marks omitted). There must be an initial attempt on cross-examination to demonstrate the improper influence, motive or recent fabrication; once such an attempt has occurred, then prior consistent statements are admissible on the redirect examination or through subsequent witnesses to show the consistency of the witness' trial testimony. *See, e.g., Wise v. State*, 546 So. 2d 1068 (Fla. 2d DCA 1989).

The prosecutor began her cross examination with a series of questions that are a textbook example of an "implied charge . . . of recent fabrication" within the meaning of section 90.801(2)(b) by suggesting that Kitchings had manufactured his testimony after fully evaluating all of the state's evidence against him.

> Q: You've had the opportunity to sit in the courtroom the whole time, right?
>
> A: Yes.
>
> Q: Listen to all of the testimony?
>
> A: Yes.
>
> Q: Every single witness?
>
> A: Sure.
>
> Q: You've got to look -- you've looked at every single exhibit?
>
> A: From a distance but yes.

Q: You have heard all of the scientific evidence?

A: Yes.

That this line of questioning amounts to an implied charge of recent fabrication was established in *State v. Boggess*, 269 So. 3d 616 (Fla. 4th DCA 2019). In that case, while cross-examining the defendant, "the state highlighted that [the defendant] sat through the trial and had the opportunity to listen to all of the witnesses' testimony." *Id.* at 619. The state also pointed to facts the defendant had omitted from an earlier statement. We observed that this line of questioning "clearly . . . suggested that Boggess fabricated his trial testimony." *Id.*

Given this charge of recent fabrication, Kitchings was entitled to have the jury consider his entire statement to the police, given before lawyers were involved, before witness statements were taken, before exhibits were collected, before scientific evidence was analyzed. Once the State implied that Kitchings' trial testimony was fabricated, the defense should have been permitted to show that Kitchings had provided an earlier, consistent statement to the police. Given the prosecutor's often misleading cross-examination about inconsistencies and omissions, introduction of the entire statement would have placed these matters in a broader context so the jury could have fully evaluated the veracity of the trial testimony. The trial judge abused her discretion by refusing to allow the admission of Kitchings' statement to the police.

The importance of this testimony, and the reason why the error cannot be deemed to be harmless, is demonstrated by the written question the jury asked during deliberations—"Whose decision was it not to show [Kitchens'] interview?"

We cannot say "beyond a reasonable doubt" that the omission of the statement to the police "did not contribute to the verdict." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

### *Under the facts developed by the time of trial, it was not error to preclude the jury from learning about M.R.'s prior allegations of rape in New York*

A second issue involves the admissibility of a prior incident in New York, where M.R. claimed to have been a victim of a violent sexual battery. We hold that the evidence developed by the time of the trial in this case was not sufficiently probative of a common scheme or plan to justify its admission under section 90.404(2), Florida Statutes (2018).

*M.R.'s Deposition*

Prior to trial, the defense took M.R.'s deposition, during which she revealed that she had been raped in New York eleven months prior to the incident in this case. She stated that she met a man (the "New York defendant") on a dating website called "Seeking Arrangement." M.R. and the New York defendant texted back and forth for about a week before meeting for dinner at a restaurant.

After dinner, they went to a bar at the hotel where the New York defendant was staying. They had a few drinks. The New York defendant said he had a present for her in his room and that he also wanted to give her his business card. M.R. accompanied him to his room, but when she got there, there was no gift.

M.R. reported that the New York defendant became aggressive with her and pushed her down on the bed. He started biting her lip, and tried to pull down her stockings. He said he wanted to have sex with her but she said no. She ran to the door and tried to escape, but he came up behind her and dragged her back to the bed where he began punching her and strangling her. The bed and bathroom were filled with blood. He kept telling her that she was going to die.

M.R. made up a story about being a single mom of a young daughter and pleaded with him to let her go once she gave him what he wanted. M.R. told him that she had to get home because a babysitter was watching her daughter and she worried that the babysitter was going to leave. She asked if she could text the babysitter and the New York defendant took her phone, asked for the number, and texted the random number M.R. gave him, asking the fake babysitter if she could stay for another hour.

To get out of the hotel room, M.R. gave in to his demands and performed oral sex on him. He ejaculated in her mouth. Before he let M.R. go, he made her wash the blood off her face.

When she left the hotel, she saw a police car parked across the street. She went over, showed the police officer a picture of the New York defendant, and stated that he tried to kill her. The police went up to the room and arrested the New York defendant.

M.R. stated that she and the New York defendant never had discussions about BDSM or sexual preferences. M.R. denied touching the New York defendant in a sexually suggestive way prior to going up to his room, other than kissing him at the restaurant and the bar. The New York defendant did not talk about urination in any way and they did not have anal sex.

She said that they had never had a conversation about exchanging money for the date and that he never paid her any money during the date, but that he tried to give her a chunk of money after he raped her, which

she declined. When asked if she received any money from the New York defendant, M.R. replied she had $400 that she had withdrawn herself that evening. She stated that she had never accepted money from any person for sex or for a date. She also stated that she had no intention of filing a civil suit against the New York defendant.

*The State's Motion in Limine*

After M.R.'s deposition, the State moved in limine to prohibit the defense from bringing out any information relating to the prior rape allegation, arguing that the admission of that evidence was precluded by section 794.022, Florida Statutes, Florida's rape shield law. The defense filed a written response, asserting that it should be permitted to cross-examine M.R. about the New York case because such evidence constituted reverse *Williams*[1] rule evidence, admissible pursuant to section 90.404(2)(a), Florida Statutes, as well as impeachment evidence. The defense also argued that Florida's rape shield law did not preclude the admissibility of such evidence.

The trial court held a hearing on the motion. At the time of the hearing, the New York defendant's criminal case was still pending. The defense provided the following evidence for the court's in-camera review: (1) transcripts of M.R.'s depositions; (2) a compilation of surveillance videos showing M.R. and the New York defendant on their date; and (3) screenshots from the "Seeking Arrangement" website.

One video showed M.R. and the New York defendant at a restaurant for about an hour. The next video showed M.R. and the New York defendant walking into the hotel to deposit his luggage. Later, the surveillance video showed them leaving the hotel and going to an ATM, where the New York defendant withdrew $500. They went back to the hotel and made their way to the bar, where they are seen having drinks and kissing. During their time in the bar, the New York defendant left the bar alone and is seen on surveillance video withdrawing an additional $500 from the same ATM. He then returns to the bar where he and M.R. continue to have drinks. Surveillance footage shows them leaving the bar and getting into an elevator, presumably to go up to his room. Two hours later, M.R. is seen on the surveillance video getting into the elevator, exiting the hotel, and walking over to a police car. The surveillance video then shows multiple police officers getting into the hotel elevator.

The two screenshots of the Seeking Arrangement website were the home page and the "How it Works" page. The home page advertises the site as "[t]he #1 Sugar Daddy Dating Site in the World" with "Millions of Women

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

Seeking Sugar Daddies." The sign-up page prompts a potential user to indicate whether they are a "sugar baby" or a "sugar daddy/mommy." The "How it Works" page describes sugar babies as "Attractive people looking for the finer things in life . . . [who] get to experience a luxurious lifestyle and meet wealthy people on a regular basis."

Defense counsel argued that the evidence was admissible as both impeachment evidence and as reverse *Williams* rule evidence. Counsel noted that this was not a traditional *Williams* rule hearing, in that the pending criminal case in New York precluded his ability to call the New York defendant to testify directly about the incident. Counsel argued that factual similarities justified admission of the New York incident including, among other things, the fact that (1) both men claimed consent, (2) there was electronic documentation which identified both men, and (3) there was a financial motive in both cases, given the way M.R. connected with the New York defendant and the potential of suing Uber. Defense counsel stated that more similarities might emerge when the New York defendant became available as a witness.

In response, the State argued that the New York facts were too dissimilar to be admissible as reverse *Williams* rule evidence.

Following the hearing, the trial court granted the State's motion in limine, finding that evidence regarding the New York case was both inadmissible as *Williams* rule evidence and precluded by the rape shield statute.

*Standard of Review*

A ruling on *Williams* rule evidence is a matter within the broad discretion of the trial court. *Geldreich v. State*, 763 So. 2d 1114, 1116 (Fla. 4th DCA 1999). In the absence of an abuse of discretion, the trial court's ruling on admissibility will not be overturned on appeal. *Id.*

*The trial court did not abuse its discretion in ruling that the reverse Williams rule evidence was inadmissible*

The *Williams* rule is codified in section 90.404(2)(a), Florida Statutes:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

This rule "allows the State to introduce similar fact evidence of other crimes or acts by the defendant to prove a relevant matter in the

prosecution of the crimes for which he or she is on trial." *Newby v. State*, 272 So. 3d 862, 869 (Fla. 2d DCA 2019). Generally, the *Williams* rule allows the State to offer evidence of other crimes to prove a material fact at issue. *See, e.g., Williams v. State*, 621 So. 2d 413, 414-15 (Fla. 1993).

"Although the cases in Florida generally involve the offer of [section 90.404(2)(a)] evidence by the prosecution against a criminal defendant, section 90.404(2)(a) is equally applicable to evidence offered by a criminal defendant." Charles W. Ehrhardt, *Florida Evidence*, § 404.9 (2012 ed.). This is often referred to as "reverse-*Williams* rule evidence." *Id.*; *Newby*, 272 So. 3d at 869. Reverse-*Williams* rule evidence requires the "same showing of relevancy as evidence offered by the prosecution." Ehrhardt, *Florida Evidence*, § 404.9.

The Florida Supreme Court has concisely explained how the notion of "similarity" between two offenses or incidents comes into play in a *Williams* rule analysis:

> Although similarity is not a requirement for admission of other crime evidence, when the fact to be proven is, for example, identity or common plan or scheme it is generally the similarity between the charged offense and the other crime or act that gives the evidence probative value. Thus, evidence of other crimes, whether factually similar or dissimilar to the charged crime, is admissible if the evidence is relevant to prove a matter of consequence other than bad character or propensity.
>
> ***
>
> Similar fact evidence has been held admissible in sexual battery cases when the evidence was found to have a logical relationship to some material aspect of the charged crime beyond the character of the defendant or his propensity to force himself on women.

*Williams*, 621 So. 2d at 414-15. In *Williams*, involving a sexual battery prosecution, the Supreme Court held that evidence of two other sexual assaults committed by the defendant were properly admitted to show a common plan or scheme to "set up a defense of consent" by seeking out women "likely not to complain or to complain unsuccessfully." *Id.* at 417.

The common scheme or plan asserted by the defense in this case is a twist on the "Black Widow" cases, where a person engages in a pattern of poisoning sexual partners for financial gain. *See Nelson v. State*, 450 So. 2d 1223 (Fla. 4th DCA 1984); "The Black Widow," at https://www.flmd.uscourts.gov/black-widow (last visited Jan. 27, 2020).

- 16 -

The defense contends that M.R. had a financial motive for engaging in consensual sex with both men and then lying about it.

Here, the lack of direct evidence dulls the probative force of the New York incident. The New York defendant was not available to testify, so there was no first-hand account from his perspective for the jury to evaluate. Although the Seeking Arrangement website and the New York defendant's two visits to the cash machine to withdraw $1,000 suggest that M.R.'s date had a financial component, these facts do not compel that conclusion. There was no testimony that M.R. agreed to rough sex in exchange for money. There was no evidence that M.R. sought to shake down the New York defendant for money after the incident. There was no evidence that M.R. sought money from Uber, the deep pocket in this case.

There are also significant differences between this case and the New York case. The New York case involved excessive physical violence; this case did not. The New York case targeted a man of some means; the defendant in this case was an Uber driver. In the New York case, M.R. met the defendant through a dating website for "sugar daddies" and "sugar babies;" after texting each other for a week, the two connected for a dinner date. Here, there was no such targeting. M.R. hired an Uber to take her home, and the defendant just happened to be her Uber driver.

Because of the gaps in the New York story, the proffered evidence of the New York incident did not have a logical tendency to prove that M.R. had a financial motive to lie about her contact with Kitchings in this case. There was no direct evidence that M.R.'s common plan or scheme was to monetize a fabricated victimhood. The trial court did not abuse its discretion in refusing to admit evidence of the New York incident. *Compare O'Flaherty-Lewis v. State*, 230 So. 3d 15 (Fla. 4th DCA 2017) (court held that *Williams* rule evidence admissible because it demonstrated a plan to obtain money from victims by exposing an extra-marital affair).

Similarly, for the reasons that evidence of the New York incident was inadmissible as reverse *Williams* rule evidence, that evidence was also inadmissible because it did *not* fall within section 794.022(2), Florida Statutes (2019), for evidence that "tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent."

### The trial court erred in admitting the entire recorded Butterfly House statement

A third issue involves the admission of M.R.'s entire recorded statement given at the Butterfly House to rehabilitate her testimony. The jury listened to the entire recorded statement twice, once during the trial and

a second time during deliberations, with the aid of a transcript. Although it is not clear from the record, it appears that the court allowed the testimony either as substantive evidence under section 90.801(2)(b) or to rehabilitate M.R. under *Monday v. State*, 792 So. 2d 1278 (Fla. 1st DCA 2001). Neither reason justified admission of the entire prior statement.

Nothing in the cross-examination of any witness amounted to an "express or implied charge" against M.R. of "improper influence, motive, or recent fabrication" under section 90.801(2)(b). "A witness' credibility is always an issue at trial, and a general attack on that credibility" does not justify the admission of a prior consistent statement under section 90.801(2)(b). *Jenkins v. State*, 547 So. 2d 1017, 1021 (Fla. 1st DCA 1989). The entire defense in this case was that M.R.'s fabrication was *not* recent, that it began when she first contacted the 911 operator, so section 90.801(2)(b) would not apply to admit the prior statement as substantive evidence. *See Monday*, 792 So. 2d at 1281; *Bertram v. State*, 637 So. 2d 258, 260 (Fla. 2d DCA 1994) (where court noted that section 90.801(2)(b) does not apply where the defense is that charges "were fabricated, but not that they were recently fabricated"); *Hebel v. State*, 765 So. 2d 143, 146 (Fla. 2d DCA 2000).

Similarly, the entire recorded statement was not admissible under the circumstances described in *Monday*. That case holds that a prior consistent statement may be admissible as non-hearsay "if it has some value as rebutting [a] prior inconsistent statement used for impeachment." *Monday*, 792 So. 2d at 1282. As authority, *Monday* relied on a line of federal cases and Judge Friendly's concurring opinion in *United States v. Rubin*, 609 F.2d 51, 67 (2d Cir. 1979) (Friendly, J. concurring). *Monday* 792 So. 2d at 1281-82. *Monday* held that, under certain circumstances, a prior consistent statement is admissible to rehabilitate a witness who has been impeached with a prior inconsistent statement:

> [W]e conclude that the admissibility of a prior consistent statement to rehabilitate a witness who has been impeached with a prior inconsistent statement is a matter that is within the discretion of the trial judge. The trial court should not allow a prior consistent statement if it would merely repeat what the witness has said at trial. On the other hand, the trial court may exercise its discretion to admit a prior consistent statement as rehabilitation if it has some value in rebutting the prior inconsistent statement used for impeachment. As the court explained in *United States v. Pierre*, [781 F.2d 329 (2d Cir 1986)] the question is whether the prior consistent statement "has probative force bearing on credibility beyond merely showing repetition."

*Id.* at 1282.

Reference to the line of federal authority demonstrates that this use of a prior consistent statement is narrowly circumscribed, so that the exception does not swallow the general rule of inadmissibility of prior consistent statements. The cases follow the rule that the "*particular* consistent statement sought to be used has some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." *Pierre*, 781 F. 2d at 331 (emphasis supplied). For example, where a witness has denied making the prior inconsistent statement used to impeach his trial testimony, a prior consistent statement may be "used to establish a pattern of consistency that tended not simply to corroborate the trial testimony but to diminish the likelihood that the witness had made the inconsistent statement attributed to him." *Id.* "Another example of a prior consistent statement with significant rebutting force is a statement offered to clarify or amplify the meaning of the impeaching inconsistent statement." *Id.*

Rehabilitation under *Monday* and the federal cases contemplates introduction of only the consistent statement that lines up with the inconsistency that is the subject of impeachment, not the entire statement of which the consistent statement is only a small part. *Monday* involved the introduction of just two pages of a victim's diary, not the entire diary. 792 So. 2d at 1280. In *Pierre,* a DEA agent was impeached by his field notes which did not contain the fact that the defendant had refused to make a controlled drug delivery; on redirect examination, the agent was allowed to testify that "his formal report of the arrest included the fact that [the defendant] had declined to participate in a controlled delivery" of some drugs. 781 F.2d at 330. The "five single-spaced typewritten pages" of the formal report were not introduced into evidence. *Id.*

Here, the court abused its discretion by admitting the entire Butterfly House statement, not just the portions of it that were the subject of impeachment.

This error was compounded because the trial court failed to give a limiting instruction confining the jury's consideration of the statement to a single purpose. Unlike the admission of testimony under section 90.801(2)(b), when a prior consistent statement is admitted for rehabilitation purposes under *Monday*, it is not admitted as substantive evidence of the facts contained in the statement. Rather, it is admitted as non-hearsay for a more limited purpose. The admission of the prior consistent statement must therefore be accompanied by a limiting instruction. *See U.S. v. Al-Moayed,* 545 F.3d 139, 167-68 (2d Cir. 2008). For example, in *United States v. Castillo,* 14 F.3d 802, 806 (2d Cir. 1994),

the testimony of two police officers about what an undercover officer told them "was admitted for the limited purpose of clarifying the apparent contradiction brought out during the cross examination of [the undercover officer]."

Here, there was no limiting instruction. And the jury listened to the entire Butterfly House statement. Twice. Even had the trial court admitted Kitchings' initial statement to the police, the admission of the Butterfly House statement was a separate error that would compel reversal.

Based on the exclusion of Kitchings' entire initial statement to the police and the admission of M.R.'s Butterfly House statement, we reverse the judgments of conviction and remand to the circuit court for a new trial.[2]

DAMOORGIAN and KLINGENSMITH, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***

---

[2] Kitchings also complains about certain misrepresentations made by the prosecutor in closing argument, but most of them came in without objection. The most egregious argument was that Kitchings was taking Cialis-type medication to address an erection problem, for which there was no support in the record. A conviction should be based on the evidence, not on innuendo. There was no evidence, expert or otherwise, that Kitchings' sexual performance was enhanced by Viagra or Cialis-type drugs. However, there was no objection, so there was no preservation of the inappropriate comment for appeal. Although close, this argument did not rise to fundamental error.